QUALITY INNS
INTERNATIONAL, INC.

v.

McDONALD'S CORPORATION.

Civ. No. PN–87–2606.

United States District Court,
D. Maryland.

Sept. 16, 1988.

Laurence R. Hefter, Robert D. Litowitz, Griffith Price, and Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., and Harry M. Rifkin, Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff.

Stephen H. Sachs, Thomas P. Olson, Stephen S. Zimmerman, and Wilmer, Cutler & Pickering, Washington, D.C., and Karen B. Ksander, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## OPINION

NIEMEYER, District Judge.

On September 21, 1987, Quality Inns International, Inc. announced a new chain of economy hotels to be marketed under the name "McSleep Inn." The response of McDonald's Corporation was immediate. It demanded by letter sent three days later that Quality International not use the name "McSleep" because it infringed on Mc-Donald's family of marks that are characterized by the use of the prefix "Mc" combined with a generic word. Five days later, on September 29, 1987, Quality International filed this action seeking a declaratory judgment that the mark "McSleep Inn" (1) does not infringe McDonald's federally registered trademarks in violation of 15 U.S.C. § 1114; (2) does not constitute a false designation of origin or a false description or representation of services as being associated with or originating with McDonald's in violation of 15 U.S.C. § 1125(a); and (3) does not infringe or violate any common law rights that McDonald's may have to its marks.

McDonald's filed a counterclaim alleging trademark infringement and unfair competition under the same laws that Quality International invoked in its complaint for a declaratory judgment. In addition, Mc-Donald's alleges dilution of its marks in violation of the Illinois Anti–Dilution Act, Ill.Rev.Stat. Ch. 140, § 22.

The case came to trial before the Court without a jury on July 18, 1988 and concluded on July 26, 1988. The Court has reviewed all of the evidence received at trial, including the deposition testimony offered. It has studied the memoranda and cases submitted by counsel for the parties. This opinion will serve as the Court's findings of fact and conclusions of law as prescribed by Fed.R.Civ.P. 52(a).

## I. THE ISSUES

The issues are framed by the positions taken by the parties.

McDonald's alleges a straightforward trademark infringement and unfair competition action. It contends that it is the owner of a family of marks each of which is formulated by combining the prefix "Mc" with a generic word to form a fanciful trademark or service mark. It contends that the name "McSleep Inn" that has been adopted by Quality International is likely to cause confusion and that Quality International selected the word "McSleep" deliberately to trade on the goodwill and reputation of McDonald's. It

claims attorneys' fees under 15 U.S.C. § 1117.

Quality International's defenses may be summarized under four points, as follows:

1) *No likelihood of confusion:* McDonald's cannot claim ownership over every formative of "Mc" plus a generic word, and the formative "McSleep" is not a name or, when used in its logo form, is not a logo that is likely to cause confusion.

2) *Noncompeting uses:* McDonald's marks have been developed in the fast-food business and do not preclude the use of "McSleep Inn" in the lodging business.

3) *Extensive third-party uses:* By allowing or acquiescing in the use by third parties of a proliferation of the use of words formulated by combining "Mc" with a generic word, McDonald's should be denied the right to preclude the use of "McSleep Inn."

4) *"Mc" is generic:* The use of "Mc" as a prefix has become generic and has entered into the English language with a recognized meaning of its own.

## II. QUALITY INTERNATIONAL

Quality International is a Delaware corporation with its principal offices in Silver Spring, Maryland. It is engaged in the lodging business, particularly in inns, hotels, suites, and resorts. Since 1981 it has been the fastest growing hotel franchise chain in the United States and is now the third largest franchiser of hotels both in terms of hotels and rooms available. Its sales for 1987 were over $56 million.

After Robert C. Hazard, Jr. became the chief executive officer of Quality International in 1980, the company adopted a long range plan that began with an analysis segmenting the lodging market into five sections: economy, luxury budget, mid-priced, luxury, and super luxury. Mr. Hazard then aimed various products of Quality International at these market segments. Clarion Hotels and Resorts became the luxury product of Quality International; Quality Inns, the mid-priced; and Comfort Inns, the luxury budget.

Having no product to compete in the economy segment, Quality International designed a concept for a hotel with a smaller basic room which would rent for between $20 and $29 per night. Each room would have a queen size bed, plush carpeting, color TV, and a contiguous bathroom. There would be no conference rooms, food or other amenities on the premises, except a swimming pool in certain geographical areas. These economy hotels would all be of new construction and a consistent architecture. The name selected by Mr. Hazard for this product was "McSleep Inn." The first McSleep Inn is scheduled to open in December, 1988.

To improve its marketing of all products, Quality International adopted a "three chain logo" which consists of the three individualized but compatible logos for each of the products offered (Clarion, Quality Inn, and Comfort Inn), arranged horizontally under the caption "Quality International." Each logo, though different, clearly belongs to a family. The outside shape of all three is square with rounded corners and all three include within the square a stylized sun and the applicable name "Comfort," "Quality," or "Clarion."

This three chain logo will be expanded into a four chain logo when the McSleep Inns join the family of Quality International hotels and motels. As the new corporate signature of Quality International, the four chain logo will be featured in all corporate advertising.

While it is the policy of Quality International to advertise with a consistent corporate identification, at the present time, inns and motels franchised by Quality International advertise their individual facilities without reference to the corporate signature. Moreover, limited access highway signs which announce lodging at exits only depict the logo of the particular motels available at the exit; government regulations do not permit inclusion of the three chain or four chain logo. Examples of telephone directory advertising and even franchising offering materials received at trial did not include the Quality International corporate signature.

## III. MCDONALD'S CORPORATION

McDonald's Corporation is a Delaware corporation with its principal offices in Oak Brook, Illinois. Founded by Ray A. Kroc, it opened its first restaurant in April, 1955, in Des Plaines, Illinois. It is now the largest fast food business in the world, with over 10,000 restaurants in 45 countries and over $14 billion in sales annually. In the United States it owns or franchises over 8200 restaurants. McDonald's restaurants serve over 18 million people daily, and of all the people in the United States who eat out, 11 percent eat dinner and 25 percent eat breakfast at McDonald's. McDonald's claims that within the last four weeks, 89 percent of all children between the ages of two and seven and 64 percent of all adults have eaten at a McDonald's restaurant. Indeed, over 95 percent of the entire American population has eaten at a McDonald's, and eight percent of the entire work force in the United States once worked at a McDonald's restaurant.

In mass marketing McDonald's has widely promoted its business philosophy of "quality, service, cleanliness and value," or "Q.S.C.V." It first began network television advertising in 1965, and today 85 percent of its advertising is television advertising, although it also advertises on the radio and in print. In fiscal 1987, it spent over $400 million in media advertising in the United States alone. Its total expenditures for advertising and promotion over the last years have been in excess of six percent of its total sales and approximately $917 million for fiscal 1987. It is the largest single brand advertiser in the United States.

At trial McDonald's presented diverse examples of its advertising directed at particular groups and designed for particular purposes. Approximately 22 years ago, McDonald's created the figure of Ronald McDonald, a fictitious clown who presides over McDonaldland. While Ronald McDonald over the years has promoted values consistent with McDonald's intended image, he has never urged directly that children purchase McDonald's products. Ronald McDonald is also used extensively in connection with Ronald McDonald Houses, a charitable function supported by McDonald's.

McDonald's has achieved an extremely high awareness in the minds of the American public. It claims that when asked to name a fast food restaurant, 90 percent of the public will name McDonald's. The recognition of Ronald McDonald by children between the ages of two and eight is 100 percent, a figure matched only by Santa Claus.

In 1977, McDonald's began advertising a fanciful language called "McLanguage" that featured the formulation of words by combining the "Mc" prefix with a variety of nouns and adjectives. In television advertising viewed by the Court, Ronald McDonald is shown teaching children how to formulate "Mc" words, and he used words such as McService, McPrice, McFries and McBest.

In a consistent vein McDonald's has coined "Mc" words for many of its products and services. McChicken, Chicken McNuggets, Egg McMuffin or Sausage McMuffin, McD.L.T., McHappy Day, McFortune Cookie, McFeast, McCola, McPizza, McSnack are but some of the many. It has obtained trademark registrations for all of these.

McDonald's marks are not limited to the fast food area, and it has obtained registrations for the use of marks in other areas as well. In the areas of children's clothing, it owns McKids; in interstate travel plazas, McStop; in job programs, McJobs; in computer software, McClass; in ground shuttle transportation, McShuttle. It calls its own hotel at its home offices in Oak Brook, Illinois, McLodge.

There is no evidence to suggest that anyone prior to McDonald's used "Mc" with a generic word. This is not to say, however, that every use today of "Mc" plus a generic word belongs to McDonald's family of marks, a subject that is discussed further, below.

## IV. SELECTION OF THE NAME "McSLEEP"

The trade name for Quality International's new economy line of hotels, McSleep

Inn, is the brainchild of its CEO, Robert C. Hazard, Jr. At trial he described how he thought of the name at 2 o'clock one morning in November or December 1986 and jotted down notes of his ideas at bedside. He wanted a name that conveyed thrift and consistency, and from a list of several names that he considered, he selected "McSleep." He said that the "Mc" from the Scottish surname conveyed thrift. The notion of "consistency" was the new generic meaning of the prefix "Mc" in the English language. He denied that his selection was an imitation of McDonald's or that McDonald's occurred to him at the time that he selected the name McSleep. For the reasons given, the Court does not credit this testimony.

When Mr. Hazard first developed his five-year plan for Quality International, which he issued on January 1, 1983, he identified nine corporations whose values he emulated. One of the nine was McDonald's, and the values that he attributed to McDonald's, which he did not attribute to any of the other eight, were "quality, cleanliness and value" (actually McDonald's corporate philosophy was Q.S.C. V. or quality, service, cleanliness and value). Those are the very values that later became the values of Quality International for its new McSleep Inn product in a slightly different form.

In presenting his idea of McSleep Inns to the Board of Directors of Quality International in June, 1987 for approval, Mr. Hazard described the new product in terms not only suggestive of McDonald's advertising but openly modeled on the McDonald's concept:

> The marketing promise of McSleep is "a consistent, convenient, quality product at a low price."
>
> The marketing hook is the name "McSleep;" not McSleep Motor Inn or McSleep Motel—just "McSleep." The name McSleep should help consumers instantly identify the product for what it is—a consistently clean, quality product at a low price.

*    *    *    *    *    *

McSleep is aimed at the entire travel market. Like McDonald's, it is acceptable for the upscale traveler who wants only a good night's sleep and for the economy traveler who wants to save money.

Yet, when questioned at trial whether the promise of a consistent, convenient and quality product at a low price brought to mind McDonald's, Mr. Hazard said it never occurred to him, though it was possible "it might remind some folks of McDonald's." He added, however, "it didn't remind me of McDonald's."

Around the time that the McSleep concept was being presented to the Board, an early draft of the franchise brochure describing a McSleep Inn referred to the name as "instantly recognizable." This characterization was considered "wrong" by a number of management of Quality International and was deleted from the final published version. Nevertheless, the draft evidenced a perception at Quality International at that time that the McSleep Inn would enjoy instant recognition, much as Mr. Hazard had promised to his Board when he said, "the name McSleep should help consumers instantly identify the product."

In addition to his overtly expressed admiration for McDonald's and its method of doing business, which appears to be the same course that Mr. Hazard pursued for Quality International, the possibility of actually working with McDonald's in a joint venture involving an inexpensive, quality hotel with a fast-food restaurant was on the Quality International agenda at the time Mr. Hazard selected "McSleep."

Years before, McDonald's had adopted and used the name McStop in connection with a traveler's plaza for the long distance traveler. The plaza by concept included a McDonald's fast-food restaurant, a convenience store, gas station, lodging, and related businesses. While McDonald's would only own the restaurant, it would supervise the development and quality of the entire plaza and thus call it "McStop."

In the summer of 1986, Mr. James H. Nelms, a regional manager of Quality In-

ternational, had been pursuing various discussions with McDonald's and Kroh Brothers, a real estate developer, for possible participation in McStop plazas. Prior to a trade show in September of 1986, Mr. Nelms had numerous conversations to this end, and at the trade show he introduced the McDonald's representatives to Mr. Hazard. Following that brief meeting, a representative of Kroh Brothers wrote to Mr. Hazard:

As you recall, Kroh Brothers Development Company is working with McDonald's on the McStop concept. I have enclosed a flier that provides you with more information about what a McStop should be.

This letter was received by Mr. Hazard on October 2, 1986, and he referred it to Mr. Frederick W. Mosser, Quality International's vice president in charge of franchising.

Quality International and McDonald's pursued the McStop concept further, with discussions continuing into the Spring of 1987 but without reaching any agreement. It was *after* Mr. Hazard received the letter about McStop, however, when he selected the name McSleep for his new, budget-market product.

The final factor contributing to the Court's belief that Mr. Hazard had McDonald's in mind when he selected the name McSleep is the evidence that Mr. Hazard's thinking was not limited to the one word McSleep, but rather a family of words, all created by using the prefix "Mc" with a generic word. In the Spring of 1987 when he instructed his attorneys to register and protect the name McSleep, he also directed registration of the names "McSuite" (which he intended to use for two rooms at McSleep Inn connected by a door) and "McBudget." At trial, Quality International indicated its abandonment of the "McSuite" name and concept, and no evidence was received about the role or intended use of McBudget.

Following selection of the name McSleep, and prior to presentation of the concept to the Board of Directors of Quality International in June, 1987, a trademark search was conducted of "McSleep" in which the report revealed to Quality International management numerous uses of "Mc" formatives owned by McDonald's. Mr. Frederick W. Mosser, the vice president in charge of franchising, said that he was surprised at how many marks McDonald's owned. He indicated that while he perceived some risk in proceeding with the name McSleep, he felt that these reservations were overcome in his mind by the facts that McDonald's was in the food business and Quality International was in the lodging business, and that the names would be displayed in a distinctive manner.

Following approval by the Board in June of 1987, Mr. Hazard directed Susan B. Dynerman, his director of public relations, to make preparations for the public announcement of McSleep Inn at the trade show in Chicago in September 1987. When Mr. Hazard advised Ms. Dynerman of the new product, she raised questions "whether we could use the name.... I associated it with McDonald's."

A similar concern was expressed by Quality International's advertising agency. The account representative, Mr. Barry Smith, anticipated that McDonald's "would be overjoyed" with the McSleep Inn announcement, and he promptly proceeded to obtain an indemnity agreement from Quality International, protecting the agency against litigation by McDonald's. He had never before asked for an indemnity agreement from Quality International during the ten years that the agency had been representing Quality International.

Several weeks before the public announcement, Mr. Hazard engaged a market research firm to conduct a survey to determine which of several mock up versions of a McSleep Inn room had the most consumer appeal. The survey was conducted of 120 people outside of Quality International and a slightly larger number of employees. Each participant was given a questionnaire inquiring about specific aspects of the rooms under consideration. There was one question, however, inserted at Mr. Hazard's request, that read as follows: "What is your overall impression of the name 'McSleep Inn' for the type of hotel/motel

accommodations described in the above statement?" The respondent was then given a choice of four grades ranging from "excellent name" to "poor name." Over 40 of the respondents volunteered a written comment in response to that question suggesting an association with McDonald's. Typical of the comments were: "Sounds like relationship to McDonald's food chain," or "Sounds cute but I thought it might be affiliated with McDonald's," or "Possibly owned by McDonald's," or "Reminds me of McDonald's."

When Mr. Charles Riter, president of the research firm, advised Mr. Hazard of the result some three to four weeks before the public announcement, Mr. Hazard agreed that it had occurred to him that "some people might associate or refer to or see in the name McSleep some relationships with McDonald's." He observed that the confusion, if any, associated the room with a "greasy hamburger" and that did not bother him, because the rooms were better.

In September 1987, at a meeting of Quality International's sales force convened to announce the new McSleep Inn product, questions also were raised by salespersons of Quality International whether Quality International had the right to use the name McSleep.

Despite the persistent questioning by representatives of Quality International with respect to its rights to use McSleep Inn, Mr. Hazard proceeded with the public announcement on September 21, 1987. A press release was issued and Mr. Hazard also delivered a speech to the trade show in Chicago describing his new hotel. Prior to the public announcement, he invited interviews with the *Washington Post* and a trade magazine, *Hotel and Motel Management*. In the *Washington Post* article, Mr. Hazard is quoted as saying:

> Obviously, [the name is] a takeoff on McDonald's and quality at a consistent price.... We think we're going to let McDonald's continue to use their name.

Mr. Hazard admitted making that statement generally but stated he did not refer to the *name* of McDonald's but rather the *concept*. He added that the final sentence in the quote was made in jest in response to the reporter's persistent questioning about McDonald's.

With respect to the interview given to *Hotel and Motel Management*, Mr. Hazard expressed complete confidence in the reporter, who was a long-time friend. Mr. Hazard acknowledged the accuracy of all the quotations made of him and does not fault the reporter for making any comments. That article reported as follows:

> And yes, the not-so-subtle reference to fast-food giant McDonald's is purely intentional.
>
> "The concept is just like McDonald's," Hazard said. "A guy making $150,000 a year can eat there and feel comfortable and a guy making $10,000 a year can eat there and feel comfortable because he knows what he's getting—consistent quality. And that doesn't exist in the lodging industry."

The inquiries about McDonald's, that began with employees and continued with reporters, were repeated by the attendees at the conference in Chicago.

Quality International not only was aware of the risk that attended its adoption and use of the name McSleep Inn, a risk that it was infringing McDonald's family of marks, but it also had good reason to believe that the public might be actually confused. It nevertheless proceeded with both the announcement and its plans to sell franchises for McSleep Inn.

Three days after the public announcement, McDonald's wrote to Quality International complaining of its planned use of the words "McSleep" and "McSuite" and demanding the immediate discontinuance of those plans. There followed some telephone conversations between the parties, but before any issue was resolved, Quality International filed suit in this court, five days after McDonald's sent its letter.

Beginning in June, 1987 Quality International began making changes in the presentation of McSleep Inn that were intended to emphasize McSleep Inn's association with Quality International. Quality International's four chain logo was to be pictured on a

flag to be placed outside each McSleep Inn, on a decal to be placed on the front door, and on the wall behind the registration desk. It changed the name from "McSleep" to "McSleep Inn." It adopted a policy of including the four chain logo with all corporate advertising. And three weeks before trial, after the Court had already heard motions for summary judgment in this case, it added a small sign underneath the McSleep Inn sign on the main pylon in front of the hotel which reads "by Quality International."

The McSleep Inn mark has not been exposed to the consuming public in connection with the sale of McSleep Inn services, although hundreds of franchise packets have been sent out to potential franchisees of McSleep Inn. To date only four franchises are signed up, but others are in process. The first McSleep Inn is scheduled to open in Pikesville, Maryland, in December 1988.

The earliest justifications given by Mr. Hazard and Mr. Mosser, the vice president in charge of franchising, for using the name McSleep Inn in the face of McDonald's family of marks, were grounded on the observation that McDonald's was in the fast-food business and Quality International was in the lodging business. Later they urged that the "Mc" prefix had become generic and was in the English lexicon and that the mark McSleep Inn would be displayed in a distinctive manner.

## V. SURVEY TESTIMONY

It is undisputed that appropriate survey evidence is meaningful to establish the likelihood of confusion, and at trial each party presented survey evidence of its own and offered a critique of the survey evidence presented by the other.

A mall intercept survey was conducted on behalf of Quality International by Dr. Jacob Jacoby, a professor at New York University. This type of survey is conducted at randomly selected shopping malls by showing participants a visual stimulus and obtaining responses to questions.

Dr. Jacoby's survey was actually four separate surveys, each conducted in con-nection with a different visual stimulus. About 160 respondents were interviewed in each of the surveys. The first of the four stimuli used in the mall intercept survey by Dr. Jacoby was an advertisement for Quality International as it would appear in an airline magazine. The text of the advertisement contained a reference to McSleep Inn along with other products of Quality International, and the four chain logo was included at the bottom. That advertisement did not advertise McSleep Inn specifically. The second stimulus was a mock up of a yellow page display advertisement in which a McSleep Inn was advertised with the McSleep Inn logo and the four chain logo which included the name Quality International. The third stimulus was an artist rendering of a proposed McSleep Inn in front of which was a sign on a pylon that included the McSleep Inn logo and under which there was a smaller sign with the words "by Quality International." Finally, a control survey was conducted by showing the respondents a picture of an Egg McMuffin sandwich with the words Egg McMuffin written underneath it.

In connection with the survey involving the airline advertisement, despite the fact that arrows were added to the advertisement pointing to McSleep Inn, only 57 percent of those surveyed were aware that McSleep Inn was being advertised. Of those 57 percent, in response to the question "Who or what company, or companies, is that [that owns or operates this motel]?" only 7.5 percent responded "McDonald's."

In connection with the yellow page stimulus, of 164 respondents, 83 percent (or 136 respondents) knew that the advertisement was advertising McSleep Inn. Of those, 10.3 percent identified McDonald's as the name of the company that owns or operates McSleep Inn.

With respect to the artist's rendering of a McSleep Inn, 163 respondents were shown the picture and 147 indicated they knew that McSleep Inn was being advertised. Of those 16.3 percent said that McDonald's was the company that owns or operates the hotel. If the responses are limited to those who had made decisions

during the previous year about staying in hotels or motels, 21.4 percent of those responding identified McDonald's as the owner or operator of the McSleep Inn.

Finally, with respect to the picture of an Egg McMuffin, 87 percent of those shown the picture identified it as a product of McDonald's.

Dr. Jacoby concluded that these figures reflected "a low level of likelihood of confusion." He went on to point out that one would predict that as McSleep Inns were advertised and became more widely known to the public "even the current low level of likely confusion would be substantially reduced."

McDonald's offered two surveys conducted by Dr. Hans Zeisel, a professor at the University of Chicago. His first survey was a telephone survey conducted of a statistical sample of the population consisting of 400 persons randomly selected. The first two questions asked of the respondents were:

> If you were driving along the highway and you saw a sign for a hotel called McSleep Inn [the name is spelled out], what would you expect this hotel to be like?

and

> And who or what company do you believe owns or operates this hotel called McSleep Inn?

Dr. Zeisel testified that the first question was a warmup that introduces the respondent to the subject of the inquiry, i.e. McSleep Inn, and that the second question was the critical one. In response to the second question, 31 percent of the people surveyed answered, "McDonald's." If only the respondents who stayed in a hotel at least once during the past 12 months are included, 33 percent answered "McDonald's;" and if only respondents who stayed in hotels at least 12 times during the past year are counted, 39 percent responded "McDonald's." He concluded that naming a hotel "McSleep Inn" would likely cause confusion among "a substantial proportion of the population by leading them to believe that this hotel is somehow related to McDonald's."

Dr. Jacoby, Quality International's expert, criticized the survey by Dr. Zeisel, arguing that the warmup question was merely a free association question which was leading and prompted the answer to the second question. It was also contended that the survey only tested auditory response to McSleep Inn and provided no visual stimulus, which was unlike the real world. He urged that a "mall intercept" survey would be superior.

Although Dr. Zeisel was not in favor of mall intercept surveys because such surveys cannot as a practical matter be performed on a valid statistical sample, in response to the criticism of Dr. Jacoby he conducted a second survey using a visual stimulus. In the second survey, Dr. Zeisel also eliminated the first question of his first survey to prove, as he testified, that the first question did not materially alter the results.

The mall intercept survey conducted by Dr. Zeisel interviewed 401 persons at randomly selected shopping malls across the country. After two unrelated warmup questions, the respondent was asked the following question:

> Please take a look at this. Here is a photograph of a sign for a hotel you might see if you were driving along the highway. [The witness was then shown the McSleep Inn logo that is the subject of registration before the Patent and Trademark Office.] Who or what company do you believe owns or operates this hotel?

Over 31 percent (31.9%) of all the respondents expressed the belief that McDonald's owns or operates the hotel. If only respondents who stayed in a hotel at least once during the last 12 months are included, 34.5 percent believed that McDonald's owns or operates McSleep Inn; and if only respondents who stayed in hotels 12 or more times during the past year are included, 38.5 percent believed that McDonald's owns or operates McSleep Inn.

The results obtained by Dr. Zeisel in his two surveys are not materially different,

producing results within a percentage point or two of each other.

Dr. Zeisel criticized Dr. Jacoby's surveys in several respects. The principal criticisms were in three areas. With respect to the airline magazine advertisement and the yellow page advertisement, the McSleep Inn trademark was so diluted by the Quality Inns logo that a significant number of people did not even know that McSleep Inn was being advertised. In that context, he did not believe that any meaningful results were obtained. With respect to the artist's rendering of the McSleep Inn, he agreed that the concept was appropriate, but criticized the fact that the respondent was shown a logo that included the phrase "by Quality International" underneath it. Not only did he consider that to be nothing more than a reading exercise for the respondent, but he observed that the respondent was allowed to retain the picture in front of him when answering the questions.

McDonald's presented evidence that showed that of the 70 persons in Dr. Jacoby's survey who correctly identified the hotel with Quality International, 50 said they did so because they read it on the sign. When asked why they identified McSleep Inn with Quality International, typical responses were: "It says so on the ad," "The ad tells you that it's operated by Quality Inns International," "Because it says so," or "Because it says so on the sign I just read." McDonald's offered similar evidence on the yellow page advertisement and the airline advertisement where the respondents indicated they simply read Quality International in the advertisement.

Quality International justified its inclusion of "by Quality International" with the reason that it had made the decision to include that on the sign and wanted to test real life circumstances.

## VI. APPLICABLE LEGAL PRINCIPLES

▆ Trademark law gives the owner of a mark the right to preclude a use by a junior owner of a mark that causes or is likely to cause confusion, cause mistake, or deceive an appreciable number of typical consumers into believing that some sponsorship, association, affiliation, connection, or endorsement exists between the owner of the senior mark and the owner of the junior mark. *See*, e.g. 15 U.S.C. § 1114(a), but common law concepts of unfair competition are similar. The gist of a claim for trademark infringement, or the related commonlaw tort, is a sanction against one who trades by confusion on the goodwill or reputation of another, whether by intention or not. There are but two inchoative elements that must be established for entitlement, from which all permutations and guises of the cause of action are derived: the senior owner of the mark must demonstrate (1) the adoption and use of a mark and his entitlement to enforce it, and (2) the adoption and use by a junior user of a mark that is likely to cause confusion that goods or services emanate from the senior owner. *Yale Electric Corp. v. Robertson*, 26 F.2d 972 (2d Cir.1928). The articulation of standards and criteria are numerous for reaching the conclusion whether plaintiff has made his case.

▆ The owner of a mark who has developed a reputation and identity with a mark through his products, service, marketing, and presence in the market, has an interest in protecting the business and reputation for which the mark stands, not only at the present time in the current markets in which he does business, but for future times and in related markets that the development of his business might naturally take him. *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245 (4th Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970); *Yale Electric Corp. v. Robertson*, 26 F.2d 972 (2d Cir. 1928); *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268 (S.D.N.Y.1986). The extent to which he may protect this interest relates directly to the strength of his mark. While one mark may not enjoy the strength of identity to preclude use of a junior mark in a related field or neighboring market, another may enjoy such recognition that confusion might result outside his own field or beyond the markets in which he does business. *See, e.g. Maier Brewing*

*Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117 (9th Cir.), *cert. denied*, 391 U.S. 966, 88 S.Ct. 2037, 20 L.Ed.2d 879 (1968) (beer vs. scotch); *Cook Chemical Co. v. Cook Paint & Varnish Co.*, 185 F.2d 365 (8th Cir.1950) (paint vs. insecticide); *Carling Brewing Co., Inc. v. Philip Morris, Inc.*, 277 F.Supp. 326 (N.D.Ga.1967) (beer vs. tobacco); *Esquire, Inc. v. Maira*, 101 F.Supp. 398 (M.D.Pa.1951) (magazine vs. clothing store). The measurement of this strength is revealed by evidence demonstrating a likelihood of confusion. The relationship of these two factors, strength and confusion, operates such that evidence of strength of a mark is perhaps the most significant factor in predicting the likelihood of confusion. On the other hand, evidence of the likelihood of confusion in a related field or neighboring market, or even in a competitive market, defines the scope of a mark's enforcement and therefore is the measurement of its strength. Variations on the weight of evidence on these two aspects, i.e., the strength of the mark and the likelihood of confusion, will determine whether one mark will preclude the use of a later adopted and used mark.

■ Accordingly, a mark may enjoy such strength that it may be enforced in related fields or neighboring markets, whether they are product markets or territorial markets. Or, stated obversely, the likelihood of confusion in related fields or neighboring markets will demonstrate the strength of the mark. *Communications Satellite Corp. v. Comcet, Inc., supra; Yale Electric Corp. v. Robertson, supra; McDonald's Corp. v. McBagel's, Inc., supra*. Thus, a mark is not to be confined formulistically to a classification established by the Patent and Trademark Office or by lines of market competition. A mark is the identity of a corporation, a product or a service, and to the extent goodwill attaches, it knows no boundaries. Its reach is its strength. Where the public is confused and attributes a source, product, or service incorrectly, the owner of the mark, even though not a competitor, may experience damage to his reputation and goodwill. Both of these may have more meaning to the owner than immediate profits in the marketplace because they represent the potential for long range future profits.

On the other hand, two marks that serve to identify products in two unrelated markets may very well coexist without confusion in the public's eye. Thus *Notre Dame* brand imported french cheese has been permitted to coexist with *Notre Dame* University; *Bulova* watches with *Bulova* shoes; *Alligator* raincoats with *Alligator* cigarettes; "This Bud's for you" in beer commercials with the same phrase used by a florist; *White House* tea and coffee with *White House* milk; *Blue Shield* medical care plan with *Blue Shield* mattresses; *Family Circle* magazine with *Family Circle* department store; *Ole'* cigars with *Ole'* tequila; and *Sunkist* fruits with *Sunkist* bakery products. The list continues.

■ The determinative test cannot focus on how close or related the industries or products are, but rather by whether confusion is created so that an appreciable number of typical consumers will likely be confused.

It cannot be overlooked, however, that a close affinity of markets for two different products or services can create in the public perception a belief or expectation that one would be expected to go into the other. This belief or expectation becomes a factor in explaining confusion that may be shown between two products that do not compete with each other. Thus, the relatedness of markets in which the competing marks are used is relevant to the likelihood-of-confusion issue.

■ The enforcement of trademark rights to prevent use on related, but noncompetitive, goods is sometimes referred to as the "Aunt Jemima doctrine." The rule dates from the 1917 decision of the Second Circuit in *Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407 (2d Cir.1917) *cert. denied*, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1918), which enforced the mark "Aunt Jemima" used by the plaintiff on pancake batter against use of the same mark on defendant's pancake syrup. The court rejected the old rule limiting enforcement to competitive goods and said a mark would

be protected on any goods which buyers would be likely to think came from the same source as plaintiff's goods.

> [W]e think that goods, though different, may be so related as to fall within the mischief which equity should prevent. Syrup and flour are both food products, and food products are commonly used together. Obviously the public, or a large part of it, seeing this trademark on a syrup, would conclude that it was made by the complainant. In this way the complainant's reputation is put in the hands of the defendant.

247 F. 409–10. The Aunt Jemima doctrine was given strong impetus in *Yale Electric Corp. v. Robertson, supra,* where the owner of the Yale mark used in connection with the sale of locks, was permitted to preclude the use of the mark in connection with the sale of flashlights. In an oft-quoted opinion, Judge Learned Hand noted that infringement and injury can occur even when the junior user uses a mark on related, but noncompetitive, goods:

> However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful.... The disparity in quality between [the senior user's] such wares and anything the [junior user] makes no longer counts.... The [senior user] need not permit another to attach to its good will the consequences of trade methods not its own.

26 F.2d at 974 (citations omitted).

When the strength of the mark is so pervasive, however, to the point that the public actually attributes competitive products or services to the mark without the intent of attributing source, then the mark may be lost to the public domain. The public comes to understand the mark to refer only to the kind of goods and not to the origin. Thus, once enforceable marks such as aspirin, thermos, cellophane, and escalator have become generic words. *Bayer Co., Inc. v. United Drug Co.,* 272 F. 505 (2d Cir.1921); *King–Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir.1963); *King–Seeley Thermos Co. v. Aladdin Industries, Inc.,* 418 F.2d 31 (2d Cir.1969); *DuPont Cellophane Co., Inc. v. Waxed Products Co., Inc.,* 85 F.2d 75 (2d Cir.1936); *Haughton Elevator Co. v. Seeberger,* 85 U.S.P.Q. 80 (1950).

It is therefore necessary to measure, on the one side, the strength of the mark asserted and, on the other, the factors suggesting a likelihood of confusion, fully recognizing even as separate analyses are discussed that the two are integrally related. The first of these, strength of the mark, is now analyzed factually and how it is affected by charges that (1) third-party uses of McDonald's marks have eroded or precluded their enforcement and (2) the prefix "Mc" is now generic.

## VII. STRENGTH OF MCDONALD'S MARKS

McDonald's golden arches and the McDonald's logo rank among the strongest marks, enjoying instant recognition among virtually all members of our society. As noted earlier, evidence showed that among children McDonald's "Ronald McDonald" enjoys virtually 100 percent recognition. To take judicial notice of a mark would perhaps be unprecedented, but the parties were not troubled with the notion in this case as to some of McDonald's marks such as the golden arches and Big Mac. *See* Fed.R.Evid. 201. Because of the ample presentation of evidence on the promotion and awareness of the marks of McDonald's, the Court will not be required to consider whether judicial notice should be

taken here. McDonald's spends almost a billion dollars each year on marketing and advertising, a sum which increases steadily with its sales, which are at $14 billion. While the fact that McDonald's is the largest single brand advertiser in the United States could alone lead to the conclusion of the strong public awareness of its marks, the evidence showed affirmatively that awareness was virtually universal, to the point where a journalist could allude to McDonald's, without using its name, by coining words as "McLaw," "McPaper," and "McFashion."

The power of this public recognition of McDonald's is evidenced in various ways.

In recent years, McDonald's began to focus on a long distance travel market, defined by customers traveling on the road who are more than 30 miles from home when they use the service. Pursuing this market, McDonald's took over numerous tollway restaurants and converted them to McDonald's restaurants. After the first year of conversion, the increased sales at all of the restaurants that were converted averaged over three times the previous year's sales, and indeed the sale of gas at the neighboring gas station increased significantly, although not as much. McDonald's attributes these successes to its recognition.

The attribution to McDonald's, however, has not been totally under its control. Journalists have created their own words by adding "Mc" to a generic word. The Court was presented with literally hundreds of such uses, such as McLaw, McTax, McNews, McPaper, McSurgery, McArt, even McGod. Since the issue is raised in this action that "Mc" words have become generic, the Court will address the scope of this usage more fully below.

■ As part of its promotion, McDonald's created a language that it called "McLanguage" from which it developed a family of marks for its products such as McChicken, McNugget, McPizza, as well as marks outside the food area related to its business such as McStop, McKids, and McShuttle. There is no evidence that this language or these marks existed before

McDonald's created them or that, outside of McDonald's sphere of promotion and presence, anyone would understand these words to mean anything. "Mc" obviously is a Scottish or Irish surname used in proper names. The use to form words, however, was unique at the time. The marks that are owned by McDonald's and that were formulated by combining "Mc" and a generic word are fanciful and enjoy a meaning that associates the product immediately with McDonald's and its products and service.

They also constitute a family of marks that is enforceable against infringing uses, and since they are fanciful they will be given the strongest protection. *McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268 (S.D.N.Y.1986).

■ A family of marks may have a synergistic recognition that is greater than the sum of each mark. But that is not to say that the prefix "Mc" coupled with any generic word may be precluded by McDonald's. Each allegedly offending use must be tested against the likelihood of confusion, for the scope of enforceability, as the Court has already noted, is measured by the scope of confusion.

In this case the only examination that is made, and the only conclusions that are reached, relate to the allegedly infringing use of "McSleep Inn" by Quality International in the lodging business.

## VIII. THIRD–PARTY USES OF "MC"

Quality International has pointed out that there are a substantial number of third-party uses of "Mc" with a generic word that would give rise to infringement to the same extent as would the mark McSleep Inn. Quality International urges that these uses by third parties are so pervasive that McDonald's should now be denied the right to enforce its marks against McSleep Inn.

In recent years a significant number of third-party uses of "Mc" with a generic word has occurred in the commercial area. While the plaintiff proffered many such purportedly infringing marks from the

trademark register, the Court received into evidence as relevant only those marks on which there was evidence of actual use in the marketplace. These uses were evidenced by telephone directories, visual observations, credit reports, newspaper references, and telephone calls to the businesses.

The evidence established that there are many third-party uses. McHappy and McDonuts are used for baked goods and doughnuts in Ohio and the midwest area. McMaid is used for maid service franchising in various midwestern states. McDivots is used for golf accessories in the Colorado area. McFranchise is used for management consulting in the northeast. McMoose is used in Heritage Park on the east coast. McWest is used for contracting. McSports is used for a sports store in a strip shopping center. McPrint is used for franchised printing in the New York area. McQuick is used for quick change lubrications in the midwest area, mostly Indiana. McBud is a florist in the midwest.

Prior to 1984, McCrory's used McBurger, McCheddar, and McCheese for various hamburger sandwiches. These uses were phased out pursuant to an agreement with McDonald's, and McCrory's retained only Captain Mac's restaurant. Likewise, McAuto is used for computer data by McDonnell Douglas, but it, too, is being phased out. McJeans has been used to label wholesale jeans, but not at retail. McDuck is used in connection with greeting cards in a small business which has $3,000 in advertising per year. McTavern is used to name a lounge and deli in Indiana. There were other uses, but most of them are not significant in terms of market, product, advertising, or public awareness. Still other names use the prefix "Mac," instead of "Mc." While McDonald's has the well-known marks "Big Mac" and "Mac Attack," no formulated mark using a prefix "Mac" plus a generic word was brought to the Court's attention.

There are four of these third-party uses which the Court considers significant: McQuick for franchised oil change operations in the midwest, McPrint for franchised printing shops in the New York area, McHappy for baked goods in the midwest, and McMaid for the franchising of maid service in the Chicago area. In these instances, the uses were franchised for use at multiple locations, and they must be considered when examining the strength and enforceability of McDonald's marks in this case.

While McDonald's elected not to present evidence on its policing activities, contending perhaps correctly in this case that the issue is not whether they enforce marks against others, but rather whether objectively there are third-party uses that dilute the strength of their marks, evidence did come in peripherally suggesting action being taken by McDonald's against firms using McHappy, McTravel, McDivots, McQuick, McMaid, McPrint, and others.

■ Permitting the use by third parties of infringing marks can be relevant to three specific issues in a trademark case. If a trademark owner has expressly or impliedly given an assurance to another user that he will not assert his trademark rights, he may be barred from enforcing his mark *against that user,* by reason of estoppel by acquiescence. *Sweetheart Plastics, Inc. v. Detroit Forming, Inc.,* 743 F.2d 1039 (4th Cir.1984).

■ Acquiescence may be inferred from conduct as well. Thus, delay in enforcement of a mark against a defendant may become relevant to the question of estoppel by acquiescence. *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss Jena,* 433 F.2d 686 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971); *Ambrosia Chocolate Co. v. Ambrosia Cake Bakery,* 165 F.2d 693 (4th Cir.1947), *cert. denied,* 333 U.S. 882, 68 S.Ct. 914, 92 L.Ed. 1157 (1948). Whether a trademark owner delayed in enforcing its trademark rights *against others,* however, is not relevant to establishing an estoppel defense, since estoppel by acquiescence focuses on a plaintiff's acts *toward the defendant,* not toward others. Acquiescence is a personal defense that merely results in a loss of rights against the defendant. *Sweetheart Plastics,* 743 F.2d at 1046.

■ Third-party uses permitted by the owner of a mark may also be probative of the abandonment of a mark by the owner. A mark is abandoned when any course of conduct of the owner, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin. *See* 15 U.S.C. § 1127(b). Failing to take action against an infringer has been held to be such an "act of omission." *Sweetheart Plastics,* 743 F.2d at 1047; *Wallpaper Mfgs. Ltd. v. Crown Wallcovering Corp.,* 680 F.2d 755, 766 (C.C.P.A.1982). Once a mark has been held abandoned, it is free for all to use and falls into the public domain. It may be seized by another, and the person doing so gains rights against the whole world. 15 U.S.C. § 1115. However, as the court in *Sweetheart Plastics* emphasized, "[t]he issue is hardly ever 'abandonment,' because that requires proof that the mark has lost all significance as an indication of origin" and is "completely without signs of life." 743 F.2d at 1047–48.

■ So long as there is no abandonment or estoppel by acquiescence, a trademark owner's tolerance of third-party uses of his marks will not bar enforcement of his rights against an infringing user. It may, however, bear on the issue of the strength of his mark. The damage that third-party users of a mark can cause an owner who seeks to enforce his mark is the weakening of the mark's strength. Failure to take reasonable steps to prevent third-party uses of the mark may weaken a mark to the point where it is entitled to only a narrow scope of enforcement, and ultimately the question may become one of abandonment. However, where the owner of the mark has been reasonably diligent in protecting his rights, even though infringements exist, no intent to abandon will be inferred. J. Thomas McCarthy, Trademarks and Unfair Competition, § 17:5 (2d Ed.1984 & Supp.1987).

■ In this case Quality International does not contend that McDonald's has abandoned its family of marks or that McDonald's has acquiesced in Quality International's use of McSleep Inn. The Court likewise reaches those same conclusions based on the evidence presented. McDonald's gave no assurances, expressly or impliedly, to Quality International that it could use McSleep Inn, and McDonald's did not delay in pursuing enforcement of its marks. The evidence of third-party uses introduced by Quality Inns therefore is probative only of the strength and scope of McDonald's family of marks. These uses will not preclude the enforcement of those marks against Quality International.

The Court can point to no evidence that public awareness of McDonald's family of marks and their attribution of source to McDonald's has been lessened by the third-party uses. The more important question, and probably the only relevant one, is whether third-party uses are so prevalent that the public would not likely confuse McSleep Inn with McDonald's. The Court found no evidence to suggest impact by third-party uses on this question of confusion. Although the question is more fully encompassed in the answer to the issue whether McSleep Inn is likely to cause confusion, which is discussed below, suffice it to conclude at this point that third-party uses do not preclude McDonald's enforcement of its family of marks.

## IX. GENERIC DEFENSE

Both Mr. Hazard, Quality International's CEO, and Mr. Mosser, its vice president in charge of franchising, urged at trial that "Mc" has become a generic prefix meaning thrifty, consistent, and perhaps convenient. They urge that the notion of thriftiness comes from the association with the Scots and the perception that the Scots are thrifty. The Court was directed to the writings of H.L. Mencken, the famous Baltimore journalist and writer, who said:

> Nearly all the English words and phrases based on *Scotch* embody references to the traditional penuriousness of the Scots, *for example Scotch coffee,* hot water flavored with burnt biscuit; *to play the Scotch organ,* to put money in a cash register; *Scotch pint,* a two-quart bottle; *Scotch sixpence,* a threepence; and the *Scotchman's cinema,* Piccadilly

Circus, because it offers many free attractions.

*The American Language by H.L. Mencken* (4th Ed. Abridged with Annotations and Material by Raven I. [appropriately] McDavid, Jr.), at pages 388–89.

Both Mr. Hazard and Mr. Mosser acknowledge that the aspect of "Mc" that includes consistency and convenience derives from McDonald's and its extensive promotional efforts. They urge, however, that any such association with McDonald's is now lost to the public domain by common usage.

In support of the contention that "Mc" as a prefix has derived a singular meaning and become part of the language, Dr. Roger W. Shuy, a linguist from Georgetown University, reviewed hundreds of journalistic uses of the prefix "Mc" for purposes of deriving its meaning and to evidence it common usage. Several examples will give a sampling of the broad range of his findings.

The term "McFood" has been used as follows: "It's a push-button, do-it-yourself, convenience-oriented world.... Why cook when we can zap a Lean Cuisine in the micro, or order McFood from a drive-in McSpeaker." Similarly, the word McLunch has been used for what kids are eating in school.

In the area of clothes, McFashion has been used in connection with smaller, specialized express stores for kids, imitating the concept of a fast food outlet.

McMedicine has been used to refer to prompt, inexpensive medical care centers, and McSurgery becomes surgery without overnight hospital stays.

McLaw has been used to describe the legal franchise phenomenon, suggesting that legal advice is dispensed through drive-in windows. Describing franchising in other areas have been McFuneral for funeral operations; McLube or McOil Change for the fast, little drive-in shops offering ten-minute oil changes; and McMiz for franchising of the Broadway musical "Les Miserables." Even the franchising of local post office branches has

been suggested to become McMail, and franchised tax preparation as McTax.

In the news and media area, *USA Today* has been characterized as McPaper, "fast news for the fast-food generation." There was even a book called *The Making of McPaper.* The distillation of books or books without substance has been referred to as McBook, and similar characterizations have been made about digested news stories, McNews.

Even culture that has been subjected to mass marketing has been characterized with the prefix "Mc." The proliferation of low-cost mass-produced art is McArt. One article even referred to McMozart.

Movies that are analogized to fast food which satisfy the appetite and taste good have been called McMovies or McCinemas. Similarly, there is McTelevision, McTelecast, and McVideo.

No subject seems to have been excluded. In connection with religion there has. been a reference to McGod: "It was a difficult year for the McGod family network. [Jimmy Baker, Jimmy Swaggart, and Jerry Falwell] fought a major turf battle over control of the PTL McTelevangelism."

One article perhaps summarized it all, "This is the era of instant gratification, of poptops, quick wash, fast fix, frozen foods, *McEverything.*"

A news report placed into evidence referred to the trial before this Court as taking place in the McCourt, which, of course, would make the judge the McJudge. While the Court understood that association with the Courthouse in Baltimore, it could not come to grips with the suggestion that the trial was before a McJudge. The Court could find few, if any, of the attributes of "Mc" used by McDonald's or by the journalists otherwise to fit. Perhaps this McPinion will fulfill that prophecy.

After reviewing these articles and numerous others, Dr. Shuy reviewed the context of the "Mc" word and derived a list of 27 definitions for the prefix "Mc": highly advertised; franchise; easy access; inexpensive; high volume; lacks prestige, com-

fort, cost; everyday; prepackaged; specialty chain; quick; convenient; reduces choices; self-service; mass merchandising; standardized; state of the art marketing; low brow; assembly line precision; uniform; market dominance formula; handy location; positive attitude; simple; comfortable; honest; looks okay; and working man. He reduced these to four terms which he characterizes as the definition of "Mc," that is, "basic, convenient, inexpensive, and standardized."

McDonald's retained an outside firm to do its own internal marketing research into the public perception of the meaning of "Mc" and the conclusions reached were similar to those reached by Dr. Shuy. McDonald's list, which was much shorter, distilled the following definitions: (1) "reliable at a good price," (2) "prepackaged, consistent, fast, and easy" (3) "a prefix McDonald's adds to everything it does," and (4) "processed, simplified, has the punch taken out of it."

Dr. David W. Lightfoot, a linguist from the University of Maryland, testified at trial on behalf of McDonald's. He took no issue with the meanings derived by Dr. Shuy and by McDonald's own internal survey. However, he disputed vigorously any notion that "Mc" is a generic word. He pointed out that "Mc" does not have a single easy identifiable meaning. For instance, of the 27 or so definitions derived by Dr. Shuy from the journalistic uses, many were not incorporated into Dr. Shuy's condensed definition. Dr. Lightfoot concluded that all the meanings derived by Dr. Shuy, by McDonald's and by him were essentially descriptive of McDonald's Corporation and the reputation it has earned over the years. He concluded that whether or not there was a specific reference to McDonald's Corporation in each article, in every case the allusion was to McDonald's and its family of marks in a manner that was intended to be cute and playful.

The Court concludes that indeed the uses in the press of "Mc" plus a generic word are coined and novel to each article for the playful use by the author. In each case the allusion, whether express or implied,

was to McDonald's, sometimes flattering and sometimes pejorative. There was no single independent meaning of "Mc" understood in the language and its uses have been created to convey any one of several attributes that the author makes to McDonald's.

■ This is not analogous to a circumstance where a product is referred to so frequently by brand name that even competitive brands are called by the one name and the brand identity is lost. On the contrary, the attribution of source to McDonald's in the use of "Mc" is strong and persists. The Court notes that while most of the articles used by Dr. Shuy did not contain express allusions to McDonald's, a very similar group of articles that he did not use in his analysis, but which conveyed the same meanings, made express allusions to McDonald's. The Court therefore rejects any contention that McDonald's has lost its right to enforce its marks because "Mc" has become a prefix with a single meaning that has become part of the English language and beyond McDonald's control.

## X. LIKELIHOOD OF CONFUSION

The central question for resolution in this litigation is whether the use of McSleep Inn is likely to cause confusion so that an appreciable number of the public attribute the product and services of McSleep Inn to McDonald's. *Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208 (2d Cir.1985); *Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 689 F.2d 1127 (2d Cir.1982); *Eastern Wine Corp. v. Winslow–Warren, Ltd.,* 137 F.2d 955 (2d Cir.), *cert. denied,* 320 U.S. 758, 64 S.Ct. 65, 88 L.Ed. 452 (1943).

■ When the junior mark has not been presented to the consuming public, as it has not been in the instant case, there is less opportunity to determine whether actual confusion exists. In circumstances such as these, other factors for analysis become important. In *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522 (4th Cir.1984), the Fourth Circuit accepted a list of seven factors to consider in determining the likeli-

hood of confusion. The list, which was borrowed from *Sun–Fun Products v. Suntan Research and Development, Inc.*, 656 F.2d 186, 189 (5th Cir.1981), directs inquiry into the following factors: (1) the strength or distinctiveness of the mark; (2) the similarity of the two marks; (3) the similarity of the goods or services which the marks identify; (4) the similarity of the facilities used by the parties in conducting their businesses; (5) the similarity of advertising used by the parties; (6) the defendant's intent; and (7) actual confusion.

The Second Circuit has developed a similar list of some nine factors to consider, as follows: (1) the strength of the mark; (2) the similarity between the two marks; (3) the similarity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) the good faith of the junior user in adopting its mark; (7) the quality of the junior user's product; (8) the sophistication of buyers; and (9) the relative harm to the parties if an injunction is granted. *See Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir.), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531 (2d Cir.1964); *McDonald's Corp. v. McBagel's Inc.*, 649 F.Supp. 1268 (S.D.N.Y.1986).

These lists are not exhaustive or exclusive, and some of the factors may not always be relevant or equally emphasized in each case. However, they focus logically an inquiry that must be tailored to the factual circumstances of each case.

The circumstances of this case make for a specialized analysis. The offending mark has not been presented to the consuming public, except by way of announcement and trade shows. The product will not directly compete with any of the products of McDonald's. And McDonald's is not asserting a single mark but a family of marks.

The Court will therefore address in addition to the strength of the marks, which the Court has considered at length and determined to be especially important to any conclusion, the following: (1) the evidence of confusion; (2) the similarity of the contexts of uses of the marks such as the logo forms in which they are presented, the similarity of facilities on which they are used, the media forms in which they are used, and any other language or logos which might distinguish them or make them more similar; (3) the proximity of the markets for the products and services identified by the marks, and the likelihood that the gap between the markets will be bridged; and (4) the intent of the junior user in adopting his mark and his good faith in doing so.

### Evidence of Confusion

With the announcement of McSleep Inn, the questions from the press and the industry as to whether Quality International would be infringing on the marks of McDonald's were instantaneous. The message directed to Quality International by reporters and potential customers was "what will McDonald's think?" The association was immediate and unambiguous.

When officers and employees of Quality International first became aware of the new product and name, they raised the same questions. Mr. Mosser, the franchising vice-president, was aware of the risk. Ms. Dynerman, the public relations director, expressed concern. The employees of Quality International verbalized their concern that the name sounds like McDonald's. The concern was that even if McDonald's was not affiliated with Quality International, perhaps a perception could reasonably be entertained that McDonald's and Quality International were somehow together in the McSleep Inns venture so that McDonald's reputation would be on the line.

It is true that mere association may not amount to confusion. It is one thing to say that a use brings McDonald's to mind, but without confusion that McDonald's is behind the product or service, and quite another to conclude that an appreciable number of typical consumers are likely to become actually confused. In the former case, there will be no trademark violation since trademark law does not pro-

tect words alone. Unlike a copyright, mere reproduction of a trademark is not an infringement. Thus, a non-confusing parody of a famous mark ("Jordache" vs. "Lardashe") would not be trademark infringement because the owner of the mark "does not own in gross the penumbral customer awareness of its name, nor the fallout from its advertising." *Jordache Enterprises, Inc. v. Hogg Wyld, Ltd.*, 625 F.Supp. 48, 56 (D.N.M.1985), *aff'd*, 828 F.2d 1482 (10th Cir.1987). As Justice Holmes said:

> [W]hat new rights does the trademark confer? It does not confer a right to prohibit the use of the word or words. It is not a copyright.... A trademark only gives the right to prohibit the use of it so far as to protect the owner's goodwill against the sale of another's product as his.... When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo.

*Prestonettes, Inc. v. Coty*, 264 U.S. 359, 360, 44 S.Ct. 350, 350, 68 L.Ed. 731 (1924) (citations omitted); *see also University of Notre Dame Du Lac v. J.C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372 (Fed.Cir. 1983); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655 (2d Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980).

It can be argued persuasively, however, that in this case the level of association reaches a level so great that confusion is likely to result. The question could well be asked: "With so much suggestion of or association with McDonald's, could it be true that perhaps McDonald's is a sponsor of McSleep Inns?"

■ The question whether a "likelihood of confusion" exists is, however, answered most persuasively by the survey evidence presented at trial. Although none of the surveys was perfect, they all spoke consistently that an appreciable number of consumers would be confused.

In Dr. Zeisel's telephonic survey, the responses were closest to a statistical sample. Its greatest shortcoming was that perhaps the first question, which allowed the respondent to associate, brought McDonald's to mind and therefore provided fuel for the next question as to who owns or sponsors McSleep Inn. The fear of any poison from that methodology, however, was allayed by his second survey which produced almost the same results. It is also noted that Dr. Zeisel conducted surveys, which he used as control for the research here, with the names "McTravel" and a concocted name "McTavish." With respect to McTravel (using "Mc" plus a generic word), confusion with McDonald's resulted, but with respect to McTavish (using what appears to be a proper name), there was virtually no confusion. In both Dr. Zeisel used the same warm-up question as he did in the telephone survey.

Because the telephonic survey could not present visual depictions of the mark, Dr. Zeisel did a mall intercept survey. That type of survey traditionally does not have a statistical probability because as a practical matter it is focused on randomly sampled shopping malls which are inherently biased. Both experts used this method, however, and the testimony received indicated that it was a popular method for use in the marketing industry. This survey by Dr. Zeisel revealed the same level of confusion as did the telephone survey. Over 30 percent confused the name McSleep Inn with McDonald's, a level which the Court concludes is substantial.

Projecting 30 percent to the 144 million people, which Dr. Zeisel concluded was the potential audience for McSleep Inn, over 40 million people would be expected to be confused if his surveys were statistically correct.

Dr. Jacoby, Quality International's expert, criticized Dr. Zeisel's leading question and the absence of visual stimuli. As the Court has noted, it concludes that at least the leading question criticism may have been theoretically correct, but it did not as a practical matter materially alter the data.

Dr. Jacoby conducted his own survey using as stimuli: an airline travel magazine advertisement for Quality International, a mock up yellow pages advertisement, and an artist's rendering showing McSleep Inn

with a clarifying sign underneath it which reads, "by Quality International." The magazine advertisement was so diluted in its presentation, focusing principally on the Quality Inns range of products, that the Court concludes that it was not useful data to consider. Likewise, there was significant confusion relating to the yellow page advertising. In addition, the yellow page advertisement was under a display advertisement for Hilton Hotels leaving a significant number of respondents to relate the advertisement to Hilton Hotels. The Court does not consider the results of the surveys on these two stimuli as relevant.

The response to the question of who owns or sponsors McSleep Inn as shown in the artist's rendering was relevant. This was a depiction of what a McSleep Inn would look like to a consumer and measures at least that response.

The Court accepts that data, however, with some reservations in view of the inclusion of the sign "by Quality International" prominently added under the McSleep Inn logo. The issues in this lawsuit were framed around the use of the name McSleep Inn and perhaps the use of McSleep Inn's logo that is subject to registration in the Patent and Trademark Office. In none of those usages is the qualifying language "by Quality International" included. Quality International contends, however, that since it will be using the qualifying words, they should be included in any inquiry. Nothing requires that "by Quality International" be included in every use of McSleep Inn. The evidence showed that in fact individual franchisees of Quality International did not advertise the association with Quality International. Thus, a Comfort Inn franchisee would only advertise in brochures its own inn and the amenities offered there. Also, interstate and limited access highways that have signs advertising inns do not allow the qualifying language "by Quality International" on them. They would only allow the McSleep Inn logo. The spoken or written use of McSleep Inn would not always be able to include the limiting phrase.

The most troubling aspect of the survey using the limiting phrase, however, was the fact that over 70 percent of the respondents who correctly associated McSleep Inn with Quality International did so because they were reading the qualifying language "by Quality International." While that response may measure the particular stimulus which includes the logo with the qualifying language, it does not measure the confusion that is caused by the name McSleep Inn or by the McSleep Inn logo.

Notwithstanding these concerns with the Jacoby survey, it did measure the extent of confusion in response to that limited stimulus. Twenty-four of the 147 persons who understood that McSleep Inn was being advertised, or 16.3 percent, said that McDonald's was the owner or operator of the hotel, and if the survey is limited to persons who make the decision about where to stay when traveling, 21.4 percent believed that McSleep Inn, even with the clarifying language, was owned or sponsored by McDonald's. This is, in the Court's judgment, the most indicting evidence on the likelihood of confusion. In the absence of the clarifying language, the evidence shows that the extent of confusion jumps significantly. Even the 16.3 percent is an appreciable number that cannot be dismissed.

Both experts acknowledged that there are inherent distortions in surveys which they call "noise." But none estimated that the extent of this noise would ever rise above a few percentage points. Thus, the Court concludes that with the 16.3 percent minimum shown by the evidence, an appreciable number of consumers are likely to be confused by the use of the name McSleep Inn, even with the qualifying language "by Quality International."

*Similarity of Contexts of Marks*

Quality International urges the Court to compare visually the logos of the parties to assess on a visual basis the likelihood of confusion. It also directs the attention of the Court to the appearances of facilities and the differences of advertising, all factors listed by the Fourth Circuit in *Pizzeria Uno Corp. v. Temple, supra,* for

consideration in determining the likelihood of confusion.

Based on the observation of the logos of the parties, pictures and renderings of the facilities, and the advertising utilized by the parties, the Court agrees that, in the absence of the name McSleep Inn, confusion is not likely to result. The logos of the parties are distinctive, as are the facilities. By looking at a rendering of a McSleep Inn facility one would not be confused into believing it was sponsored by or related to McDonald's or its restaurants. The advertising of Quality International, moreover, focuses on the traveler and usually uses the print medium that confronts the traveler. On the other hand, McDonald's primarily utilizes national television advertising.

Thus, although the Court agrees that the logos in design, color and shape, as well as the facilities, are not confusingly similar, it is the use of the name McSleep Inn that suggests an ownership, sponsorship, or association with McDonald's.

■ The confusion caused by the name is not mitigated to an acceptable level by the distinctive uses of the logo, facilities and advertising. Even use of the clarifying language "by Quality International" and the substantial use of its corporate signature does not avoid the likelihood of confusion in this case. Quality International's own survey evidence shows that even with all the mitigating factors, which were clearly depicted (more clearly than would be the case in real life) in a rendering of a McSleep Inn, still 16% to 20% of the public would continue to believe that it was sponsored by McDonald's. Projected across the 144 million people who are considered to be the potential audience for McSleep Inn, well over 20 million would be likely to be confused. This is not an insubstantial number.

The Court concludes that the name McSleep is so similar to the McDonald's family of marks that in whatever clothing it is dressed, the public will persist in perceiving some connection with McDonald's. The marketing hook, as Mr. Hazard observed, is the name McSleep, which would

be "instantly recognized." So long as the word McSleep is used, the infringement occurs. This holding, however, would not preclude a name such as "Sleep–Inn," for it is not the logo or the word "sleep" that causes the problem; it is the use of the fancifully coined word, McSleep.

### Relatedness of Products

Quality International urges that marks in the lodging business cannot be confused with marks in the food business. This is not based on applicable legal principles and is not consistent with the demonstrated facts.

The evidence did show that Quality International's McSleep Inns would not compete with a line of products sponsored by McDonald's. There was no showing that McDonald's was in the lodging business or that it planned to enter that market. It has developed a strategy to pursue the long-distance traveler and to promote plazas called McStop, but in each case, the purpose is and would be to promote its food business.

The evidence showed, however, that the fast food and the motel business were related. Some motels actually provide food in competition with fast food businesses which seem to spring up around motels. Quality International recognizes this relatedness in its own franchise agreement which prohibits its franchisees from using the name McSleep Inn or variation of it in the food business. Quality International's other products, moreover, promote food and lodging together. The public has come to associate the two markets to such an extent that one would expect that McDonald's has or would enter into this market. This was amply demonstrated by all the survey evidence in which an applicable number of the public would believe that a McSleep Inn was sponsored by McDonald's.

Thus, while the Court does not consider it necessary to find the relatedness of markets, because the evidence of confusion builds in that perception by the public, the evidence is undisputed that lodging and fast foods are natural partners, as Mr. Hazard noted in the notes that he prepared

for the meeting with McDonald's in April 1987.

As noted earlier, the boundaries of enforceability of a mark are defined by where and in what markets an appreciable number of the public are confused. Here the confusion in a different, but related market, entitles McDonald's to enforce its marks in that market.

*Intent of Quality International*

Intent of the infringing user to confuse is not necessary to establish a likelihood of confusion. On the other hand, the existence of an intent to confuse is "strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." *Pizzeria Uno*, 747 F.2d at 1535. And an intentional infringement will entitle a plaintiff to an injunction; the defendant has no equity to object to one. *Safeway Stores, Inc. v. Dunnell*, 172 F.2d 649 (9th Cir.), *cert. denied*, 337 U.S. 907, 69 S.Ct. 1049, 93 L.Ed. 1719 (1949); *Aunt Jemima Mills Co. v. Rigney & Co.*, 247 F. 407 (2d Cir.1917), *cert. denied*, 245 U.S. 672, 38 S.Ct. 222, 62 L.Ed. 540 (1917); *Travelodge Corp. v. Siragusa*, 228 F.Supp. 238 (N.D.Ala.1964), *aff'd*, 352 F.2d 516 (5th Cir.1965).

The intent to trade on the goodwill or reputation of another projects as does a missile to its target. In the absence of evidence of actual confusion, a Court may conclude, therefore, that the intended infringement would hit its target; certainly the infringer should not be the one to complain that it did not.

The Court finds that Mr. Hazard hoped that Quality International would become the "McDonald's of lodging." He believed, though mistakenly, that because he was in the lodging business and McDonald's was in the fast food business, he was free to borrow, and expected that the confusion that would result would benefit his product. He wanted instant recognition, an image of consistency, quality, and value, all at the courtesy of McDonald's.

There is a universe of names to select from and he combined "Mc" plus the generic word "sleep," a combination that he knew McDonald's invented and which had no meaning except to associate a product or service with McDonald's. Despite his protestations, which the Court concludes were too vigorous, the Court finds that Mr. Hazard had McDonald's in mind in the selection of the name and planned to use the name as the marketing hook—a reputation instantly understood by the public and a prophesy which Quality International intended to fulfill.

Perhaps he had a good faith belief he could use the name legally and truly intended, after adopting it, to try to distinguish it from McDonald's. But its use was not available.

While the intent of Mr. Hazard in the selection and adoption of the name was deliberate, the Court believes that he and his staff believed that the use could be defended, albeit with a tainted understanding of their rights. Quality International knew of the risk but elected to proceed. Perhaps the initiation of this suit so promptly was the ultimate recognition of the risk.

## XI. CONCLUSIONS

For the reasons given the Court finds and concludes that (1) McDonald's is entitled to enforce its family of marks that are characterized by the combination of the prefix "Mc" with a generic word; (2) the name McSleep Inn is likely to cause an appreciable number of the public to be confused by believing that McSleep Inn is sponsored, associated, affiliated, connected, or endorsed by McDonald's; and (3) the adoption and use by Quality International of the name McSleep Inn was a deliberate attempt to benefit by the good will and reputation of McDonald's. Therefore, the Court will find trademark infringement, unfair competition, and dilution under the Illinois statute (Ill.Rev.Stat. Ch. 140, § 22).

## XII. RELIEF

On the Court's finding of trademark infringement and unfair competition, it will

**222**

enter a permanent injunction in this case. Courts have a wide range of discretion in framing injunctions. *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352 (2d Cir.1983). In *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979), the defendant was allowed to continue use of its contested mark but only in connection with its own distinctive house mark or logo. In other cases, courts have determined that some form of disclaimer of association is sufficient to preclude likely confusion. *See, e.g. Mushroom Makers, Inc. v. R.G. Barry Corp.*, 441 F.Supp. 1220 (S.D.N.Y. 1977), *aff'd*, 580 F.2d 44 (2d Cir.1978) (junior user must prominently display statement that it does not make shoes or that it is not associated with senior user), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

In this case, however, Quality International attempted before trial to avoid confusion by the very restrictions a court might consider appropriate. The evidence demonstrated that any such restrictions would not suffice to avoid confusion. Accordingly, the injunction will without qualification prohibit Quality International from using the name "McSleep" as a mark or as part of a mark.

To give effect to the injunction, the Court will require Quality International to advise its franchises of this injunction and to require them to refrain from using the name "McSleep" as a mark or as part of a mark.

Finally, the Court will require Quality International to report to the Court within 30 days that it has complied with the injunction.

McDonald's has asked that this Court find that the circumstances of this case are "exceptional" as that term is used in 15 U.S.C. § 1117 and therefore award it attorney's fees. When this provision for attorney's fees was added to the Lanham Act in 1975, Congress intended it to be applied where the acts of infringement can be characterized as unconscionable, malicious, fraudulent, deliberate or willful. S.Rep. No. 93–1400, 93rd Cong., 2d Sess. (1974), 1974 U.S.Code Cong. & Admin.

News 7132, 7133 (1975); *Five Platters, Inc. v. Purdie*, 419 F.Supp. 372 (D.Md.1976). Some cases have viewed this as requiring some form of fraudulent conduct of the type that is inherent in counterfeiting or "palming off." *Armstrong Cork Co. v. Armstrong Plastic Covers Co.*, 434 F.Supp. 860 (E.D.Mo.1977); *Playboy Enterprises, Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272 (9th Cir.1982). Others have noted that the conduct need only be deliberate and willful. *Quaker State Oil Refining Co. v. Kooltone, Inc.*, 649 F.2d 94 (2d Cir.1981). In any case, it is an issue of discretion based on all the circumstances.

In this case no evidence was presented that McDonald's sustained any damage. Quality International pursued this action promptly, before it opened its first McSleep Inn, to resolve the cloud over the name which it incorrectly perceived it could use. It is true that the Court concluded that Quality International's selection of the name was a deliberate attempt to trade on the good will and reputation of McDonald's. But Mr. Hazard, who selected the name, believed that it was defensible because of the non-competing products and services with which the marks would be used. Most importantly, however, Quality International did not at any time seek to conceal its sponsorship of McSleep Inn. Its first announcement began with the statement that Quality International was introducing the new line of hotels.

For these reasons, the Court determines that this case is not "exceptional" as that term is used in 15 U.S.C. § 1117, and it will deny the request for attorney's fees.

A separate order will be entered consistent with this opinion.

### INJUNCTION AND ORDER

For the reasons given in the Opinion issued this date, it is hereby ORDERED this 16th day of September, 1988, by the United States District Court for the District of Maryland, that:

1. Quality Inns International, Inc., its officers, directors, and agents are permanently prohibited and enjoined from using

the name "McSleep" as a trademark or service mark or as part of such a mark or in any other commercial manner;

2. Quality Inns International, Inc. is directed to advise each franchisee of McSleep Inn of the terms of this Order and shall require the franchisee to refrain from using the name "McSleep" as a trademark or service mark or as part of such a mark or in any other commercial manner;

3. Quality Inns International, Inc. shall, within thirty days from the date of this Order, file a report with the Court, with a copy to McDonald's Corporation, setting forth the manner in which it has complied with the terms of this Order;

4. The request of McDonald's Corporation for attorney's fees pursuant to 15 U.S. C. § 1117 is denied;

5. Costs of this action shall be paid by Quality Inns International, Inc.