McDONALD'S CORPORATION, Plaintiff,

v.

DRUCK AND GERNER, DDS., P.C.,
d/b/a McDental, Defendants.

No. 90–CV–960 FJS.[1]

United States District Court,
N.D. New York.

Feb. 26, 1993.

1. This case was originally before the Hon. Con G. Cholakis. On June 2, 1992, the case was transferred to the Hon. Frederick J. Scullin, Jr.

**1128**

Brumbaugh, Graves, Donohue & Raymond, New York City (Parker H. Bagley, of counsel).

Carter, Conboy, Bardwell, Blackmore & Napierski, Albany, NY (James A. Resila, Gregory S. Mills, of counsel).

## MEMORANDUM–DECISION AND ORDER

SCULLIN, District Judge.

### INTRODUCTION

From October 19 through October 21, 1992, this court presided over the non-jury trial in the above-captioned case in the United States Courthouse in Albany, New York. This Memorandum–Decision constitutes the court's findings of fact and conclusions of law, in accordance with Fed.R.Civ.Pro. 52.

### BACKGROUND [2]

Plaintiff McDonald's Corporation ("Plaintiff" or "McDonald's") is a Delaware corporation whose principal place of business is in Oak Brook, Illinois. McDonald's and its franchisees operate over 8,000 restaurants in the United States, over 400 of which are located in New York State. McDonald's maintains a regional office in Latham, New York (the "Latham office"), located approximately 150 miles from Plattsburgh, New York.

Defendant Druck and Gerner, D.D.S., P.C., d/b/a McDental ("McDental" or "Defendant") [3] is a New York professional corporation located in Plattsburgh, New York that

---

2. The following facts are derived from the parties' Pre-trial Stipulation, submitted to this court on February 13, 1992, Plaintiff's post-trial findings of fact, filed with the court on October 30, 1992 without objection from Defendant and the court's own notes of the testimony and other evidence presented during the trial.

3. For the sake of simplicity, "Defendant" will be used throughout to refer to the professional corporation, McDental. The individual defendants, Drs. Druck and Gerner, will be referred to by name.

provides dental services under the name "McDental." Drs. Druck and Gerner named their corporation "McDental," and have operated under this name since the business opened on March 20, 1981 in the Pyramid Mall in Plattsburgh. At the time that they opened, Drs. Druck and Gerner placed an orange illuminated sign with the name "McDental" above the front of the office, and placed a fee schedule sign in the window. Shortly after opening in 1981, Defendant obtained a state service mark for the name "McDental" from the State of New York.[4] Defendant also applied to register the name "McDental" with the United States Patent and Trademark Office [hereinafter "USPTO"] in 1981, but the application process was not completed at that time and Defendant did not receive a federal trademark for "McDental."[5]

In 1985, Defendant opened a second "McDental" office in South Burlington, Vermont. As with the Plattsburgh office, Defendant contends that this office was "heavily advertised," and, like the Plattsburgh office, was similarly successful. However, apparently sometime subsequent to 1987, Defendant changed the name of the South Burlington office, and the business was sold in 1989. *See* Plaintiff's Statement of Contested Facts at 12, ¶ 2. Plaintiff alleges that Defendant changed the name after receiving its first protest letters. *See id.*

McDonald's alleges that it first learned of McDental in 1987, and that it quickly communicated its concern of Defendant's use of its name by way of protest letters sent to Defendant. The parties communicated via correspondence regarding the use of the name McDental, and engaged in settlement discussions, but were unable to reach an agreement.

Having been unsuccessful in its attempts to persuade Defendant to cease using the name "McDental," McDonald's initiated this lawsuit on August 30, 1990, alleging trademark infringement pursuant to 15 U.S.C. §§ 1114, 1121 and 1125, dilution of business pursuant to N.Y.Gen.Bus.Law § 368–d and unfair competition under New York common law. Plaintiff seeks a permanent injunction against all further use of "McDental," all costs associated with this action (including the cost of its consumer survey), and reasonable attorney's fees.

Defendant claims, first of all, that any infringement alleged to have occurred would have had to commence in 1981 when Defendant began using the name "McDental," and that Plaintiff had notice of such use. Defendant then asserts that in 1981 Plaintiff's family of "Mc" marks combined with generic words was not substantial enough to entitle it to enjoin the use of "McDental;" that even if it were, there is no likelihood of confusion between Plaintiff and Defendant; and, since Plaintiff had notice of the use of McDental in 1981, this action is barred under the doctrine of laches.

Plaintiff presented a number of exhibits, and the following witnesses during the trial:

Roy Bergold, Sr. Vice–President, Marketing of McDonald's Corp.;

---

4. According to Mr. John Horwitz, Asst. General Counsel to Plaintiff, whose credentials as a specialist in trademark law were not disputed, an applicant receives a state service mark simply by filing an application and paying a fee. No search is conducted to ascertain those with whom the mark might be confused, nor is it possible for others to oppose such marks. Normally, all applications for federal trademarks are published in the USPTO Official Gazette, but, unlike their federal counterparts, state service marks are not published.

5. Mr. Horwitz testified that the time between filing and publishing in the USPTO Official Gazette is usually one year. However, apparently Defendant's file was marked abandoned by the USPTO and was never noticed for ·opposition until 1989. Mr. Horwitz testified that if an applicant has not heard from the USPTO within one year, he should deem his application abandoned. Thus, according to Horwitz, the Defendant could have deemed its application abandoned as early as 1982.

In 1989, Defendant renewed its efforts to register "McDental." Plaintiff opposed Defendant's efforts, arguing that such registration would likely cause confusion with McDonald's family of "Mc" formative marks. Defendant did not defend itself in the opposition action brought by Plaintiff, and the Trademark Trial and Appeal Board rendered a decision dated January 4, 1990, entering a default judgment against McDental.

Philip Johnson, Pres., Leo Shapiro & Associates, who conducted a consumer survey on McDonald's behalf;

Dr. William J. Cromie, who is associated with Ronald McDonald charities;

John R. Horwitz, Assistant General Counsel, McDonald's Corp.; and

Dr. Jeffrey Druck, Partner in and Vice-President of Defendant.

The defendant likewise introduced a number of exhibits, and called the following witnesses:

Dr. Jeffrey Druck;

Dr. George Najim, a dentist from Essex County;

Paul E. Pontiff, an attorney from Glens Falls, New York;

Dr. Carl T. Gerner, Partner in and President of Defendant.

The issues in this case as framed by the parties' positions in their briefs and/or the trial testimony include the following: (1) whether Plaintiff owns trademark rights in a family of marks featuring the prefix "Mc" connected to generic non-food terms, (2) whether there is any likelihood that ordinary consumers are likely to be confused as to the source of Defendant's services, (3) whether Defendant's use of its name will dilute Plaintiff's business (4) whether Defendant is entitled to an affirmative defense of laches, and (5) whether defendant's default in the USPTO proceeding precludes defendant from asserting an affirmative defense of laches in the instant case under the doctrine of claims preclusion. Of these issues, the court finds it necessary to address only the first, second, and fourth.

## DISCUSSION

### I. TRADEMARK INFRINGEMENT CLAIMS

**15 U.S.C. § 1114 states, in pertinent part:**
(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .

shall be liable in a civil action by the registrant for the remedies hereinafter provided. . . .

15 U.S.C.A. § 1114 (West 1963).

**And, 15 U.S.C. § 1125(a) states, in pertinent part:**

(a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C.A. § 1125 (West Supp.1992).

The first step in resolving this case is determining whether Plaintiff possesses a trademark entitled to protection; if this is established, the court must then determine the "likelihood of confusion" with Plaintiff's marks that will result from Defendant's use of its mark. *See McDonald's Corp., Inc. v. McBagel's, Inc.,* 649 F.Supp. 1268, 1272 (S.D.N.Y.1986).

### A. FAMILY OF MARKS

McDonald's has used in commerce, and obtained federal registrations for, a number of marks distinguished by the "Mc" formative and is the exclusive owner of numerous registrations issued by the USPTO. These registrations encompass both food-related (e.g., "McDonuts") and non-food/generic ("generic") (e.g., "McD", an all-purpose cleaner) items. Underlying its trademark infringement claims is Plaintiff's contention that it possessed at the time of McDental's inception, and continues to possess, a family of

"Mc" marks such that Defendant's use of "McDental" is likely to cause confusion among consumers. This contention has been addressed by other courts in litigation involving this plaintiff. *See, e.g., J & J Snack Foods Corp. v. McDonald's Corporation,* 932 F.2d 1460 (Fed.Cir.1991) (in affirming USPTO ruling that denied trademark registration to snacks food company, court held that McDonald's possesses a family of marks wherein the prefix "Mc" is used with generic food names); *McDonald's Corp. v. McBagel's Inc.,* 649 F.Supp. 1268, 1272 (S.D.N.Y.1986) (court held that McDonald's owned a family of marks using "Mc" in combination with a generic food item).

The *McBagel's* court, which granted McDonald's request to enjoin the defendant's use of the name "McBagel's" for its restaurant, stated that, "[w]hile it does not hold a registered mark in 'Mc', plaintiff may claim protection for this prefix as a common component of a 'family of marks.'" *Id.* at 1272 (reference omitted). And, the *McBagel's* court noted that, "[t]he existence *vel non* of a family of marks is a question of fact based on the distinctiveness of the common formative component and other factors, including the extent of the family's use, advertising, promotion, and its inclusion in a number of registered and unregistered marks owned by a single party." *Id.* On an appeal from the USPTO, the Federal Circuit Court of Appeals defined a "family of marks" as

> a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner. Simply using a series of similar marks does not of itself establish the existence of a family. There must be a recognition among the purchasing public that the common characteristic is indicative of a common origin of the goods.

*J & J Snack Foods* at 1462.

Evidence produced at trial and recent caselaw clearly establish that Plaintiff possesses a family of marks comprised of the prefix "Mc" combined with food items. However, in the present case, Plaintiff must show that it has a protectable family of marks using the "Mc" prefix such that the use of "McDental" would be confused with Plaintiff's family of marks. As the *McBagel's* court explained:

> Under the Lanham Act, Section 32(1)(a), 15 USC § 1114(1)(a); as well as Section 43(a), 15 USC § 1125(a), defendants are liable for infringement if their use of the name [McDental] is likely "to cause confusion, or to cause mistake or to deceive" typical consumers into believing some sponsorship, association, affiliation, connection or endorsement exists between McDonald's and defendants.

*McBagel's,* 649 F.Supp. at 1273.

### 1. Family of Marks

■ Before the court may assess Plaintiff's family of marks vis-a-vis the name McDental, it must address an apparently somewhat unique problem not present in the other cited cases, *to wit,* resolving a dispute between the parties as to the proper date from which to assess the strength of Plaintiff's family of marks. Defendant argues that the court should assess the strength of Plaintiff's family of "Mc" marks by a 1981 time frame, based on its contention that Plaintiff had constructive and/or actual notice of Defendant's alleged infringement in 1981. Defendant contends that this is significant in that, while recognizing that Plaintiff may *presently* possess a family of marks, McDonald's did not possess a family of marks featuring the "Mc" prefix in combination with generic terms in 1981.[6] *See* Defendant's Pre–Trial Memorandum at 7.

McDonald's contends that the court should assess the strength of its "Mc" family from a present standpoint, as confusion is measured in this manner, not retroactively, and that

---

6. The number of McDonald's non-food marks in 1981 differs considerably from the number in 1992. Defendant alleges that it had constructive notice of McDonald's ownership of only three such marks in 1981. Defendant's Pre–Trial Memorandum at 9; *see also* Plaintiff's Proposed Findings of Fact and Conclusion of Law at 4–10 (listing of McDonald's USPTO registered trademarks including registration dates as of 1992).

the time frame is only relevant, if at all, to the elements of notice and delay in the laches issue. Regarding the issue of laches, Plaintiff argues that it had no notice of McDental until 1987, as this was when the corporate officers with the responsibility as to trademark matters received notice of Defendant's use of the name. Plaintiff further asserts that it took prompt action to compel Defendant to cease its use of its name. Finally, Plaintiff states that regardless of the date employed, the result is the same, as the family of marks was strong enough to justify an injunction as early as 1981 and has continued to be thereafter.

The court notes that Plaintiff is requesting equitable (injunctive) relief only; Plaintiff is not asking for any damages. As injunctive relief is prospective, it would seem illogical to suggest that the court determine "the likelihood of confusion" retroactively. The more rational approach would be to measure the strength of the "family of marks" and the "likelihood of confusion" from a present standpoint. Defendant has not provided, nor has the court located, any authority to the contrary.

In fact, as its only support for its contention that the 1981 date should be utilized, Defendant cites to a USPTO Trademark Trial and Appeal Board decision, wherein the Board considered Marion Laboratories' opposition to Biochemical's application for the trademark, "TOXI–PREP", based on the strength of its family of marks featuring the "TOXI" prefix. *See Marion Laboratories Inc. v. Biochemical/Diagnostics Inc.*, 6 U.S.P.Q.2d 1215 (1988). In addressing Marion's contention that "it has a family of 'TOXI' marks and that purchasers are likely to believe that applicant's 'TOXI–PREP' products are part of opposer's family," the Board stated:

It has been held that in order to establish ownership of a family of marks it must be shown by competent evidence "first, that

*prior to the entry into the field of the opponent's mark,* the marks containing the claimed 'family' feature or at least a substantial number of them, were used and promoted together by the proponent in such a matter as to create public recognition coupled with an association of common origin predicated on the 'family' feature; and second, that the 'family' feature is distinctive. . . ."

*Id.* at 1218 (quoting *Land–O–Nod Co. v. Paulison*, 220 U.S.P.Q. 61, 65–66 (T.T.A.B. 1983) (emphasis added)).

■ Defendant emphasizes the underlined portion above as support for its contention that 1981 is the date from which the court must measure the strength of Plaintiff's family of marks, as this was the year that Defendant entered the opponent's field. As *Marion* involved an opposition proceeding, and not a trademark infringement action, it is not binding authority for this court. It establishes no legal precedent on this issue. More importantly, although Defendant emphasizes the highlighted language above, Defendant omitted the Board's subsequent explanation that "prior to" means "prior to the [ ] filing date of [Biochemical's] application [to the USPTO to register the trademark], *the earliest date on which applicant may rely.*" *Id.* (emphasis added). In other words, an opposer (e.g., McDonald's) may only measure its family of marks as of the date that the applicant (e.g., McDental) filed its application to register its trademark ("McDental") with the USPTO—he cannot linger after receiving notice of Defendant's application until his family's strength increases, and then measure his family strength from that date, i.e., "entry into the market" refers to the date of a defendant's trademark application, and not the date that the defendant began using the allegedly infringing name.[7]

Thus, even if *Marion*'s rationale were relevant to the present case, 1989 (and not

---

7. The apparent rationale behind this is that holders of existing trademarks receive notice of potential infringers through the application process, as all applications, once properly processed, are published in the USPTO publication, the Official Gazette, as discussed previously. Then, opposers such as the Plaintiff here are

expected to voice their opposition within a reasonable time, as occurred in this case in 1989.

The court substitutes the present parties only for purposes of illustration, as the present suit is a trademark infringement action, rather than an opposition (to a trademark application) proceeding.

1981) would be the proper year to utilize, as this was the date that Defendant's application for its trademark "McDental" was finally noticed for opposition.

The court therefore finds that the strength of Plaintiff's family of marks should be measured from a present standpoint, and that the dispute over the dates is relevant only to the issue of notice in the laches defense.

As stated, numerous courts have held that Plaintiff possesses a family of marks using the "Mc" formative entitled to trademark protection. *See, e.g., McBagel's,* 649 F.Supp. 1268; *J & J Snack Foods,* 932 F.2d 1460. Defendant, however, while acknowledging that "courts have held that plaintiff has a family of marks comprising [sic] of 'Mc' followed by a generic *food*-related word," Defendant's Pre–Trial Memorandum at 7 (reference omitted), disputes whether Plaintiff possesses a family of marks consisting of "Mc" in combination with all generic terms. *See id.* at 8.

As support for this contention, Defendant cites to *Quality Inns International, Inc. v. McDonald's Corp.,* 695 F.Supp. 198 (D.Md. 1988), wherein, in determining whether to enjoin Quality Inns from using the term "McSleep Inn" for a chain of economy hotels, the court stated:

> that is not to say that the prefix "Mc" coupled with any generic word may be precluded by McDonald's. Each allegedly offending use must be tested against the likelihood of confusion, for the scope of enforceability ... is measured by the scope of confusion. In this case the only examination that is made, and the only conclusions that are reached, relate to the allegedly infringing use of "McSleep Inn" by Quality International in the lodging business.

*Id.* at 212.

The *Quality Inns* court determined, nonetheless, that Plaintiff was entitled to enjoin Defendant's use of the term "McSleep Inn", noting "that the name McSleep is so similar to the McDonald's family of marks that in whatever clothing it is dressed, the public will persist in perceiving some connection with McDonald's." *Id.* at 220. In arriving at

this determination, the court noted that, "[t]he marks that are owned by McDonald's and that were formulated by combining 'Mc' and a generic word are fanciful and enjoy a meaning that associates the product immediately with McDonald's and its products and service." *Id.* at 212.

### 2. Likelihood of Confusion

■ Whether the family of marks possessed by Plaintiff is entitled to protection from Defendant's use of "McDental" turns on "whether there exists a 'likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question.'" *Thompson Medical Co., Inc. v. Pfizer, Inc.,* 753 F.2d 208, 213 (2d Cir.1985) (citation omitted). The Second Circuit has held that "such an assessment properly turns on the examination of many factors," and that this list is not exhaustive—the court may consider others. *Id.* at 213–214 (citation omitted). The factors are:

> [The] strength of the mark, the degree of similarity between the marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 213 (citing *Polaroid Corp. v. Polarad Elects. Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)). "No single *Polaroid* factor is pre-eminent, nor can the presence or absence of one without analysis of the others, determine the outcome of an infringement suit." *Id.* at 214.

Applying the *Polaroid* factors, the court finds that, as in *Quality Inns,* the following factors are of particular importance in assessing the likelihood of confusion in this case: the strength of the mark; the evidence of confusion; the similarity between the marks (including signage and advertising); the proximity of the markets for the products and services identified for the marks, and the likelihood that Plaintiff will bridge the gap; and the intent of Defendant in choosing its mark and its good faith in doing so. *See*

*Quality Inns,* 695 F.Supp. at 217. The court will discuss each of these *seriatim.*

### a. Strength of the mark

Although the strength of Plaintiff's family of marks has already been discussed at some length, it should be noted that Plaintiff offered at trial numerous exhibits and testimony attesting to the widespread familiarity of the public with Plaintiff's use of the "Mc" language. Based on all of the evidence this court concludes, as others have, that Plaintiff's family of marks is a strong one. *See, e.g., id.* at 211–212; *McBagel's,* 649 F.Supp. at 1274–1275.

### b. Evidence of confusion

Plaintiff also presented survey evidence through its witness, Philip Johnson. Johnson conducted two surveys, in 1988 and 1991, both of which evidenced a likelihood of confusion resulting from Defendant's name. Among the conclusions drawn from the surveys was a finding that some 30% of the population surveyed associated Defendant's name with Plaintiff, the same percentage that another court found to be "substantial." *Quality Inns* at 218. The court rejects Defendant's bases for disallowing the survey evidence, and credits the survey evidence.[8]

In addition to the survey evidence, Plaintiff introduced into evidence deposition testimony including that of former employees of Defendant. *See* Deps. of Kari Hathaway; William Miller; Holly Lamar. This testimony supports a finding that Defendant's name caused confusion among the public as to whether Defendant was somehow associated with Plaintiff. The court finds simply incredible Dr. Druck's testimony that he never heard anyone, even in a joking manner, associate McDental with McDonald's prior to the commencement of this lawsuit, nor did he himself ever associate the name with that of the Plaintiff.

### c. Similarity between the two marks

The *Quality Inns* court stated that, "it is not the logo or the word 'sleep' that causes the [infringement] problem; it is the use of the fancifully coined word 'McSleep'." *Id.* at 220. Likewise, the similarity between Defendant's name and Plaintiff's various "Mc" marks is obvious, and Defendant cannot hope to distinguish the two on the basis that it is the "Dental" and not the "Mc" that makes the name "instantly recognized." *See id.*

### d. Proximity of the products and the likelihood that Plaintiff will bridge the gap

This factor involves the likelihood "that customers mistakenly will assume either that [the defendant's goods] are somehow associated with [the plaintiff's] or are made by [the plaintiff]." *Centaur Communications, Ltd. v. A/S/M Communications, Inc.,* 830 F.2d 1217, 1226 (2d Cir.1987) (citation omitted). Initially, it would appear that dental services and fast food have nothing in common, except for the obvious connection between eating and dentistry, and that this factor should thus be weighed in Defendant's favor.

There was no showing at trial that the Plaintiff planned to enter the dental business *per se.* However, Dr. Cromie, who works with the Ronald McDonald charity houses, testified that since 1985, Plaintiff has included toothbrushes and other similar products in certain of its "Happy Meals" (a product for children). Dr. Cromie also testified that Plaintiff has sponsored dental cleaning via a mobile van that has travelled to different parts of the country, including parts of northern New York. Finally, Dr. Cromie added that the University of Mississippi, through a grant from Plaintiff, has been devising a dental machine for children. Although Dr. Cromie testified that Plaintiff provided the money for this machine, he could not say for certain whether the Plaintiff's name is on the machine.

The *Quality Inns* court found a connection between fast food and lodging, as one is

---

8. Defendant argued at trial that the survey included leading statements, such as, "Who or what company do you believe owns or operates McDental?" This objection was rejected by the *Quality Inns* court, due in part to the fact that there were two surveys conducted. *Id.* at 208. Although the facts are not exactly the same here, the court finds no justification for discrediting the survey evidence.

logically associated with the other. *See Quality Inns,* 695 F.Supp. at 220–221. However, notwithstanding the fact that oral hygiene normally follows the ingestion of fast (or any other) food, this court is disinclined to find that Plaintiff, even if it begins providing dental floss with its french fries, is likely to "bridge the gap" in any appreciable manner in this case. The evidence presented by Plaintiff did not convince the court that the proximity of the products in this case, or the likelihood that Plaintiff will "bridge the gap," i.e., enter the field of dental service, weighs in Plaintiff's favor.

e. Intent of Drs. Druck and Gerner and good faith in choosing the name "McDental"

When asked at trial why the name "McDental" was chosen for the business, Dr. Druck testified that the name was chosen because it had a "cute" sound to it, and a "quality of retentiveness." Dr. Druck disavowed any attempt to capitalize on the Plaintiff's well-recognized name and its association with family service and quality. He claimed, in essence, that the name was chosen because a friend of his and Dr. Gerner's, Mr. Josh Patrick, thought it was a name that they could remember—more so than other type names—that he never perceived any association with the two names, nor did he perceive anyone else having any association between the two, even in a social or humorous context.

Dr. Gerner echoed Dr. Druck's testimony in stating that the two had chosen "McDental" because they wanted a short, memorable name; that Mr. Patrick had agreed that this was the best name to use; and that Dr. Gerner never considered that there was any similarity between McDental and McDonald's. Dr. Gerner further testified that, prior to 1987, he never heard of anyone making any association between the business and the Plaintiff. However, Dr. Gerner was quoted in a news article as saying, in essence, that the choice of the name "should have been a compliment to McDonald's."

Interestingly enough, Dr. Druck also testified that a local Plattsburgh newspaper published an article entitled, "McDental Being McHassled Over McTrademark," that he "did not know" how the media learned of the lawsuit, but did admit to framing a copy of one of Plaintiff's protest letters and displaying it at the McDental office.

Contrasting with the testimony of the dentists was the testimony of Paul Pontiff, an attorney who advised Drs. Druck and Gerner regarding their name selection. In or about 1981, he had opined that "McDental" would not conflict with Plaintiff, apparently due to the dissimilar nature of the two services, although he informed Druck and Gerner that this was not a legal opinion, as he was not a patent/trademark attorney. It is difficult not to infer that the reason why the dentists sought Mr. Pontiff's opinion in this regard was that they *had indeed* considered the similarity with McDonald's in selecting their name.

The court need not deliberate long on the question of intent here. In short, the court finds that the explanations and statements of Drs. Druck and Gerner regarding the choice of the name "McDental" defy common sense and credibility; that they were fully cognizant of the name's similarity to McDonald's and chose to capitalize on Plaintiff's popularity. Consequently, the court easily finds that the good faith factor weighs in Plaintiff's favor.

Summarizing the relevant *Polaroid* factors, the court concludes that the strength of Plaintiff's mark, evidence of confusion, similarity of the marks and lack of good faith on the part of the individual defendants in choosing their name together support a finding of trademark infringement that warrants the issuance of an injunction in this case absent a valid defense. Thus, the only remaining issue is whether Defendant has proven a defense of laches.

## II. LACHES DEFENSE

Laches is a statutory defense against trademark infringement actions. *See* 15 U.S.C.A. § 1115(b)(8) (West Supp.1992). Moreover, a laches defense is applicable to all of Plaintiff's causes of action based on the federal trademark act and New York's anti-dilution statute. *See Saratoga Vichy Spring*

*Co., Inc. v. Lehman,* 625 F.2d 1037, 1040–41 (2d CIr.1980) (citations omitted).

## A. ELEMENTS

■ In order for Defendant to prevail under a defense of laches, it

must show that plaintiff had knowledge of defendant's use of its marks, that plaintiff inexcusably delayed in taking action with respect thereto, and that defendant will be prejudiced by permitting plaintiff inequitably to assert its rights at this time.

*Cuban Cigar Brands N.V. v. Upmann Intern., Inc.,* 457 F.Supp. 1090, 1096 (S.D.N.Y. 1978), *aff'd without op.,* 607 F.2d 995 (2d Cir.1979). In addition, Defendant must show that it adopted its mark in good faith. *Id.* at 1098.

### 1. Knowledge

In the instant case, it is undisputed that Defendant began using the name "McDental" in 1981. Defendant alleges that Plaintiff had actual as well as constructive notice of Defendant's mark in 1981. Defendant avers that Plaintiff received actual notice via communications to the Latham office from Mr. William R. Miller, Jr., who in 1981 was a first-year marketing assistant with the Wallace Organization, the corporation that owned the two McDonald's restaurants (franchises) in the Plattsburgh area in 1981.[9]

While Defendant claims that Plaintiff had actual and/or constructive notice of Defendant in 1981, Plaintiff maintains that it first received notice of Defendant when information regarding McDental was sent to its corporate headquarters and received by the corporate officers responsible for handling trademark affairs in 1987. Mr. Horwitz, Plaintiff's corporate employee responsible for

investigating trademark issues, testified that he received notification in 1987 from a paralegal at the Latham office who was then responsible for the reporting of trademark matters, and that he promptly initiated an investigation which eventually resulted in Plaintiff's sending protest letters to Defendant in 1987.

■ In response to Defendant's contention that Mr. Miller's alleged notice to the Latham office in 1981 constituted notice to Plaintiff, Plaintiff averred that Mr. Miller is not an agent of McDonald's, and therefore any communication from Mr. Miller to the Latham office[10] concerning Defendant did not constitute proper notice as this did not amount to notice to those employees of Plaintiff who were responsible for trademark enforcement.

The testimony of John Horwitz and other trial evidence support Plaintiff's position that the McDonald's franchisees in Plattsburgh are *not* agents of Plaintiff. *See, e.g.,* exh. 27 (licensing agreement between the Wallace Organization and Plaintiff clearly disclaims an agency relationship). The Second Circuit has held that, in a case such as the present one, knowledge will not be imputed in the absence of an agency relationship. *Dawn Donut Co., Inc. v. Hart's Food Stores, Inc.,* 267 F.2d 358 (2d Cir.1959).

[6] As to the question of constructive notice, the Second Circuit has noted that, "[a]lthough the defense of laches generally includes proof of actual knowledge by the party claimed to be barred, as in *Polaroid Corp. v. Polarad Electronics Corp.,* [*supra*], this is not an inflexible rule; a plaintiff may be barred when the defendant's conduct has been open and no adequate justification for

---

**9.** In 1981, there were two such restaurants in the Plattsburgh area: one on Margaret Street, the other on Upper Cornelia Street, in close proximity to Defendant. According to Mr. Horwitz, the restaurants are owned and operated independently of McDonald's. As such, they are not agents of Plaintiff. *See* exh. 27 at p. 16.

**10.** Mr. Miller did not testify at the trial. The court's references to Mr. Miller's statements or testimony are to Mr. Miller's deposition testimony, given on June 27, 1991.

Mr. Miller testified that he sent information regarding Defendant to a McDonald's employee at the Latham office in 1981. *See generally* Miller Dep. at 14–23. Plaintiff disputes that this information was ever received by the Latham office and, in response to Defendant's claim that Mr. Miller's testimony is "tantamount to an affidavit of service of this information upon McDonald's Corporation in 1981," Defendant's Pre-Trial Memorandum at 33, asserts that this does not amount to an affidavit under N.Y. C.P.L.R. § 306. The court agrees with Plaintiff's assertion in this regard.

ignorance is offered." *Chandon Champagne Corp. v. San Marino Wine Corp.*, 335 F.2d 531, 535 (2d Cir.1964) (citation omitted).

Defendant argues that the factors that warrant a finding of constructive notice in this case include the proximity of Defendant's operation with the Upper Cornelia Street McDonald's (allegedly less than one mile away), the presence of the Defendant in the Pyramid Mall, "a highly trafficked area," widespread advertising by Defendant in various media, the regular presence of Plaintiff's corporate employees in the Plattsburgh area, Mr. Miller's deposition testimony as to his communications with the Latham office, Plaintiff's self-proclaimed aggressive policing of its marks (and, the court adds, the opening of Defendant's second office in Vermont in 1985). Together, these factors make Plaintiff's professed ignorance of Defendant unfathomable.

The court finds merit in Defendant's argument, as it is difficult to reconcile Plaintiff's own emphasis on its aggressive policing of its trademarks with its simultaneous claims of ignorance of Defendant's existence. By Plaintiff's own admissions, its extensive family of marks requires constant vigilance in the fight against potential parasites of its good name. To attempt to persuade this court that Defendant's open and overt operation of its business (indeed, Defendant did everything short of mailing a brochure advertising its services to Plaintiff's corporate headquarters) did not constitute constructive notice simply because a certain corporate officer in Illinois had not received proper notice concerning Defendant defies logic to the same degree as each individual defendant's insistence that Plaintiff's well-known "Mc" never entered into either of their minds when selecting their name.

Plaintiff's only explanation for its apparent unawareness of Defendant is the same one offered for its lack of actual notice: that those corporate designees responsible for trademark policing had not received notice of Defendant. However, this explanation is insufficient to prevent a finding of constructive notice, and the court therefore finds that Defendant has proven constructive notice under the facts in this case, as of 1985 at the latest. If this were the only required element in the laches analysis, the court could find that the Defendant had met its burden. However, that is not the case.

*2. Delay*

It should be noted that a " 'mere delay' will not, by itself, bar a plaintiff's suit, but that there must be some element of estoppel, such as reliance by the defendant." *Saratoga Vichy Spring*, 625 F.2d at 1040 (other references omitted). And, a defendant must show that the plaintiff "inexcusably delayed" in asserting its trademark rights against the defendant. *Cuban Cigar*, 457 F.Supp. at 1096. In other words, Defendant must show that Plaintiff did, (or did not do), something as to give Defendant the belief that Plaintiff was going to "sleep on its rights." *See Citibank, N.A. v. Citytrust*, 644 F.Supp. 1011, 1014 (E.D.N.Y.1986) (citation omitted).

It is undisputed that Plaintiff's first correspondence with Defendant regarding its name was in 1987, over six years after Defendant started using its mark, and that Plaintiff did not commence its suit until August 30, 1990, which was over nine years after McDental opened its doors for business.

Although Defendant failed to prove by a preponderance of the evidence that Plaintiff received actual notice of Defendant prior to 1987, as the court finds that Plaintiff had constructive notice of Defendant at least as early as 1985, the court must measure Plaintiff's delay from this point, and not 1987 as Plaintiff argues.

Measuring from 1985 to 1987, when Plaintiff sent its first protest letters to Defendant, and considering, *inter alia*, Plaintiff's self-proclaimed vigilance in trademark matters and its feeble explanation for its ignorance of Defendant, the court finds that Plaintiff *did* inexcusably delay in asserting its trademark rights against Defendant.

*3. Prejudice*

In determining whether Defendant will be prejudiced by an injunction the court must assess "the injury to which the defendant ... will be subjected if the injunction is

# 1138

issued." *Cuban Cigar Brands*, 457 F.Supp. at 1098 n. 33 (citation omitted); i.e., whether Defendant relied on Plaintiff's conduct. *See Saratoga Vichy Spring*, 625 F.2d at 1042. Defendant generally argues that it will be prejudiced if Plaintiff prevails on its claims, citing to a case wherein the court stated that "[c]ommonly cited criteria of prejudice are the expenditure of significant amounts for the advertising and promotion of the mark or a general business expansion as a result of the increased demand for the product being sold under the mark in question." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F.Supp. 707, 718 (S.D.N.Y.1973), *modified*, 523 F.2d 1331 (2d Cir.1975).

Defendant contends that "[i]t is submitted that the facts before the Court clearly show that defendant will be prejudiced by a name change, as it is clear that defendant did not merely remain in business during the period of delay." Defendant's Pre–Trial Memorandum of Law at 43. Presumably, Defendant argues that it would be prejudiced by a name change since its success has been the result of, among other things, its past expenditures in advertising and promotion of its business under its present name, as the other criterion, expansion of the business, is not present here.[11] Defendant began as, and is presently limited to, its one "McDental" office, in Plattsburgh.

George Najim, a dentist from Essex county who testified that he had referred patients to Defendant, opined that Defendant would be hurt by an injunction in that, although "recall" patients (those already patients of Defendant) would know Defendant by the dentists' individual names, new patients would only know Defendant by its present name. However, this testimony sharply contrasted with that of Dr. Gerner, who proclaimed that the Defendant's business was so successful that it was no longer advertising for new patients; that "they had all that they could handle." By their own admissions, Drs. Druck and Gerner no longer find it

necessary to advertise under the name, McDental, due to their successful business, but rather rely on "recall" patients, and "word of mouth." Dr. Najim was unable to give any further explanation for his conclusion. For this and other reasons, the court does not credit Dr. Najim's testimony as to that point.

Defendant offered no other basis upon which this court could find prejudice, other than anticipated minimal expenses associated with changing the name on its signage and stationery, among other things. The court therefore finds that Defendant has not satisfied this element required for a laches defense.

### 4. Good Faith

"While an infringer claiming laches need not be in total ignorance of another's mark, it must be able to demonstrate the absence of any intent to confuse and deceive the public...." *Cuban Cigar Brands*, 457 F.Supp. at 1098–99 (citations omitted).

Dr. Druck testified that he initially intended to expand the concept of a "fast-service dental practice" in mall settings throughout the northeast. He testified that, in addition to New York, he is licensed to practice dentistry in Massachusetts, Vermont, Rhode Island, Connecticut and Ohio. He further testified that he and Dr. Gerner visited malls and consulted with attorneys regarding possible additional franchises and the compiling of a portfolio for prospective employees as to how the franchises would operate. After considering this plan, the use of the name "McDental" with the signage similar to Plaintiff's and the testimony and demeanor of the individual defendants the court easily concludes that their intention was to capitalize on and benefit from Plaintiff's marketing techniques. Although it may be unlikely that Defendant would entertain thoughts of expansion in the future (considering the fact that it sold its successful business in Vermont), short of an injunction, there is nothing

11. Defendant apparently had intended to expand its business, as evidenced by its opening of the Vermont business in 1985. However, even though this second business was just as successful as the original McDental (according to Drs. Druck and Gerner), the dentists changed the name of this business in 1987 and sold it in 1989. Both defendants testified that the name change did not hurt business at the Vermont office.

to preclude Defendant from attempting such an expansion in the future.

For this reason, and for the reasons previously stated in the court's earlier discussion of good faith under the *Polaroid* analysis, the court finds that Defendant has not met its burden of proving good faith in the selection of its mark. Thus, as Defendant has not proven all of the elements of the laches defense, Plaintiff is entitled to a permanent injunction in this case.

## III. REMAINING CLAIMS

As the court has found that Plaintiff is entitled to a permanent injunction based on its federal trademark claims, it declines to address the pendent state claims.

## IV. PLAINTIFF'S CLAIM FOR ATTORNEY'S FEES

 Attorney's fees may be awarded to prevailing parties in trademark actions in "exceptional cases," 15 U.S.C.A. § 1117(a) (West Supp.1992), and "[w]hether to award attorney fees, and the amount of any award, are matters that fall within the discretion of the district court." *Goodheart Clothing Co., Inc. v. Goodman Enterprises, Inc.,* 962 F.2d 268, 271 (S.D.N.Y.1992) (other references omitted). The *Quality Inns* court denied the plaintiff's request for attorney's fees, even while finding that the defendant's selection of its name in that case "was a deliberate attempt to trade on the good will and reputation of McDonald's." 695 F.Supp. at 222. While this court reaches a similar conclusion it also finds, as did the *Quality Inns* court, that the dentists' choice of their name was based, at least in part, upon their belief that the name would not constitute infringement due to the dissimilar nature of the products. *See id.* Moreover, as in *Quality Inns,* Plaintiff has not shown that it has sustained any damage as a result of Defendant's use of its name. *See id.* Thus, this court finds that an award of attorney's fees to Plaintiff is not warranted in this case.

## CONCLUSION

As Plaintiff has made the requisite showing that it is entitled to a permanent injunction on its federal trademark claims, it is hereby ORDERED this 26th day of February, 1993 by the United States District Court for the Northern District of New York that:

1. Druck and Gerner, D.D.S., P.C., d/b/a McDental, its officers, directors and agents, if any, are permanently prohibited and enjoined from using the name "McDental" as a trademark, service mark, or in connection with any other mark or an any other commercial manner;

2. McDonald's request for attorney's fees pursuant to 15 U.S.C. § 1117(a) is DENIED; and

3. Each party shall bear its own costs in this action.

IT IS SO ORDERED.